UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

GREGORY ACKERMAN,

      Plaintiff,        Case No. 17-cv-11779

v.               Honorable Thomas L. Ludington

UNITED STATES DEPARTMENT OF
AGRICULTURE, et al

      Defendant.

_____/

**ORDER GRANTING MOTIONS TO DISMISS AND GRANTING MOTION TO AMEND COMPLAINT**

On June 5, 2017, a group of farmers and incorporated farms filed suit against a number of insurance companies, the United States Department of Agriculture, the Risk Management Agency, and the Federal Crop Insurance Corporation. ECF No. 1. The Plaintiffs are dry bean farmers in Michigan, Minnesota, and North Dakota who have not received indemnity for crop insurance to which they believe they are entitled. On September 22, 2017, the Federal Defendants filed a motion for partial dismissal and the Insurance Defendants filed a motion for complete dismissal. ECF No. 39, 41. On November 9, 2017, Plaintiffs filed an amended complaint. ECF No. 50. Several weeks later, the motions to dismiss were refiled. ECF Nos. 51, 52. On March 8, 2018, Plaintiffs filed a motion for leave to file a second amended complaint which corrects the names of certain Plaintiffs. ECF No. 64. For the reasons that follow, the motions to dismiss will be granted and the motion for leave to file an amended complaint will be granted.

# I.

Plaintiffs are bringing this putative class action "on behalf of all dry bean farmers in Michigan (navy [pea] beans and small red beans), Minnesota (dark red kidney beans), and North Dakota (dark red kidney beans)." Am Compl. at 2, ECF No. 50. Each Plaintiff purchased Dry Bean Revenue Endorsement ("DRBE") crop insurance for their dry bean crops in 2015. *Id.* "The purpose of this insurance was to protect dry bean farmers against a market price decline." *Id.* However, even though "dry bean market prices declined greatly in 2015, no indemnity was paid to Plaintiffs." *Id.* In the present suit, Plaintiffs seek a declaratory judgment invalidating certain administrative determinations related to the DBRE, reforming or invaliding the insurance contracts, and ordering Defendants to pay indemnity to Plaintiffs.

Plaintiffs have named a multitude of insurance companies and several federal government entities as Defendants. The insurance companies each sold DRBE policies in 2015. Defendant United States Department of Agriculture ("USDA") "is a department of the United States Government and is the parent agency of Defendant [Risk Management Agency ("RMA")], which in turn administers Defendant [Federal Crop Insurance Corporation ("FCIC")], a wholly government-owned corporation created under the Federal Crop Insurance Act, 7 U.S.C. § 1501, et seq." *Id.* at 14.

# A.

Pursuant to 7 U.S.C. § 1523(a)(1), the Federal Crop Insurance Corporation may conduct pilot programs for crop insurance. Those proposed programs must be submitted to the FCIC Board. The Board then evaluates "whether a proposal or new risk management tool tested by the pilot program is suitable for the marketplace and addresses the needs of producers of agricultural commodities." *Id.* The current dispute arises out of a pilot program developed by "Watts and

Associates, a privately owned economic consulting firm located in Billings, Montana." Am. Compl. at 18. The FCIC Board approved the program, titled Dry Bean Revenue Endorsement, in 2012. *Id.* The pilot program became effective in 2013. *Id.* After initial success, the FCIC approved an expansion of the pilot program, to include farmers in Michigan, effective in 2014. *Id.*

Pursuant to that expansion, Michigan dry bean farmers "purchased 1,286 DBRE policies, covering 151,464 acres" in 2015. *Id.* "Minnesota dry bean farmers purchased 996 DBRE policies, covering 100,732 acres" in 2015. *Id.* "North Dakota dry bean farmers purchased 5,596 DBRE policies, covering 521,974 acres: in 2015. *Id.* at 19.

DBRE provides that farmers may elect its coverage only if they already have the "Common Crop Insurance Policy" and the "Dry Bean Crop Provisions" in force. DBRE at 1(b), ECF No. 50, Ex. A. The Common Crop Insurance Policy permits farmers to elect either revenue protection or yield protection for certain crops, not including dry beans. CCIP 2010 Amendments at 1, ECF No. 50, Ex. B. "Revenue protection provides protection against loss of revenue caused by price changes or low yields or a combination of both." *Id.* "Yield protection provides protection for production losses only." *Id.* "For crops for which revenue protection is available, a projected price and a harvest price will be determined in accordance with the Commodity Exchange Price Provisions." *Id.* Yield protection guarantees are "determined by multiplying the production guarantee by the projected price." *Id.* Thus, for yield protection, the "harvest price is not used." *Id.* Revenue protection guarantees are "determined by multiplying the production guarantee by the greater of the guaranteed price or the harvest price." *Id.* "The projected price is used to determine the premium, and any replant payment or prevented planting payment. The harvest price is used to value the production to count." *Id.*

Under the Common Crop Insurance Policy and the Dry Bean Crop Provisions addendum, dry bean farmers do not have the option of obtaining revenue protection. Rather, they are limited to yield protection guarantees. DBRE, however, provides dry bean farmers access to revenue protection guarantees.

### i.

DBRE offers two kinds of revenue protection: revenue protection without harvest price exclusion and revenue protection with harvest price exclusion. The coverage for both kinds of protection is calculated similarly. The first step is determining the projected price for dry beans. On or before February 15 of the crop year, the RMA must collect the "offer price and expected contract volume" from dry bean buyers for the various types of dry beans covered by DRBE. DRBE § 7(e)(1)(A).  After reviewing that information, the RMA will announce projected prices for bean types "no later than the third business day of March." *Id.* at § (e)(1)(D). The projected price provides the baseline guarantee for purposes of revenue protection.

Not later than December 15 of the harvest year, the RMA must announce the "harvest price" for each type of bean. *Id.* at § (e)(2)(E). The harvest price is determined pursuant to the following procedure: "The market price of each type for each day of publication during the period beginning on the first business day in September and ending on the last business day of November will be collected." *Id.* at § (e)(2)(A). The "publication" mentioned in § (e)(2)(A) refers to the "Bean Market News, a publication of the Agricultural Marketing service, USDA," which publishes weekly market prices for specific types of dry beans in specific regions. § 2. Typically, the market price will be "the sum of the market prices for that type divided by the number of prices included in that sum." *Id.* at § (e)(2)(D). If the reported market price for a certain date is qualified by "terms that indicate a small volume of sales or no sales" occurred on that date, that market activity will

be disregarded for purposes of calculating the market price. *Id.* at § (e)(2)(B). And, "if there is a market price for fewer than 50 percent of the dates of publication," no harvest price will be established. *Id.* at § (e)(2)(C).

The DBRE also provides contingencies for the event that either the projected price or harvest price cannot be calculated pursuant to the procedure provided above. Section 7(e)(3) indicates that, "[i]f a projected price for any of these types cannot be determined as described herein; . . . [t]he projected price will be determined by RMA and announced not later than the third business day of March; and . . . [t]he harvest price will equal the projected price." Section 3(c)(1) explains that if a projected price cannot be calculated for a type of dry bean, coverage for that type of bean will be subject to the terms of § 7(e)(3). Section 3(c)(2) provides that "[i]f the harvest price cannot be calculated for the crop year for a type for which a projected price was determined in accordance with section 7 of this endorsement, the harvest price will be equal to the projected price." Confusingly, the Dry Bean Revenue Insurance Standards Handbook, which is a reference material for DBRE, appears to identify a different contingency procedure for determining the harvest price when it cannot be calculated pursuant to section 7 of the DBRE. DBRE Handbook, ECF No. 50, Ex. D. In Section N, entitled "Inability to Determine a Harvest Price but a Projected Price was Established as Defined," the Handbook explains that "[i]f a harvest price cannot be determined . . . but a projected price was established . . . , RMA will establish the harvest price." *Id.* at 6.

Importantly, § 3(c) of the DBRE specifies that the contingencies for determining a projected and/or harvest price supersede "section 3(c)(5) of the Basic Provisions." Section 3(c)(5)(ii) of the Common Crop Insurance Policy, which DBRE thus supersedes, provides that when the harvest price cannot be calculated as provided by the provisions of the Common Policy,

the harvest price will be determined and announced by the FCIC. Common Crop Insurance Policy § 3(c)(5)(ii), ECF No. 50, Ex. B.

**ii.**

The DBRE provides three examples which demonstrate how indemnity is calculated. First, if a farmer chooses yield protection but not revenue protection, the DRBE protections will not apply. In that scenario, the farmer obtains yield protection for a specific number of acres and specific production guarantee per acre. *See* § 5 Example 1. In the example provided, the farmer insured 50 acres with a 1,600 lbs. per acre production guarantee, which totaled an 80,000 lbs. production guarantee. *Id.* That guarantee is multiplied by the projected price for the type of bean, and the resulting sum is the value of the guarantee (in the example, $22,400). If the farmer's actual yield is 25,000 lbs., that amount is multiplied by the projected price and then subtracted from the total guarantee. The difference between the value of the total guarantee and the farmer's actual production (measured by reference to the projected price) is the farmer's indemnity.

The second example involves a farmer choosing revenue protection (meaning the DBRE terms apply) but not harvest price exclusion. In this scenario, the "revenue protection guarantee [is] calculated using the harvest price" if the harvest price is higher than the projected price. Otherwise, the farmer "must accept 100 percent of the projected price." *Id.* at Example 2. In other words, the production guarantee is multiplied by the harvest price (not the projected price) to create the revenue protection guarantee. Similarly, the farmer's actual production is multiplied by the harvest price and that sum is subtracted by the amount of the revenue protection guarantee. The difference is the farmer's indemnity. *See id.*

In the third example, the farmer chooses both revenue protection and a harvest price exclusion. This is a variation on DBRE coverage. When these coverage options are chosen, the

"revenue protection guarantee is based on the projected price and the production to count is valued using the harvest price." *Id.* at Example 3. In other words, the revenue protection guarantee is calculated by multiplying the production guarantee by the projected price. The farmer's actual production is multiplied by the harvest price, and the value of the actual production is subtracted from the revenue protection guarantee. The remaining sum is the farmer's indemnity.

Thus, farmers who choose only yield protection do not receive additional indemnity if the market price is lower than the projected price. Farmers who choose revenue protection without the harvest price exclusion are guaranteed to receive full market-value compensation for their production guarantee and perhaps more, if the harvest price is lower than the projected price. Farmers who choose revenue protection with the harvest price exclusion are guaranteed to receive the full projected price for their production guarantee, with the amount of indemnity decreasing if the harvest price exceeds the projected price.

Because they are receiving greater protection, farmers who choose revenue protection pay a higher premium than farmers who choose only yield protection. Am. Compl. at 20. Nevertheless, if the harvest price equals the projected price, farmers covered by both kinds of protection receive identical indemnification.

## B.

Plaintiffs allege that, in 2015, "the Bean Market News did not publish market prices for navy and small red beans in Michigan or for dark red kidney beans in Minnesota and North Dakota for 50% or more of the publishing dates between September and November." *Id.* In fact, Plaintiffs further allege that only once in the preceding eight years had the Bean Market News published market prices for 50% or more of its publishing dates between September and November. *Id.* Accordingly, Plaintiffs contend that "it was not just foreseeable, but very likely, that the Bean

Market News would not publish the specified number of market prices during the specified period in 2015." *Id.*

Plaintiffs argue that the "[a]ctual market prices" for navy, small red, and dark red kidney beans were contemporaneously available and remain available from the grain elevator processors which actually bought the insured beans from the Plaintiffs. *Id.* at 22. The actual market price which Plaintiffs paid showed "a great decline from the projected prices for the subject beans." *Id.* Because the Bean Market News had not published a sufficient number of market prices for the dates in question, "the RMA set the harvest prices . . . at an amount equal to the projected prices" on December 15, 2015. *Id.* Plaintiffs argue that this act "was contrary to law [and] contrary to the intent and purpose of the DBRE" because it "negated the revenue protection insurance provided by the DBRE [and] . . . deprived Plaintiffs of the DBRE indemnity to which they are entitled." *Id.* Plaintiffs' alleged injury has been exacerbated because the Defendant insurers have "retained the additional premium paid by Plaintiffs for DBRE coverage" even though, in Plaintiffs' view, they did not actually receive revenue protection. *Id.*

## C.

On February 16, 2016, Plaintiff Greg Ackerman, the chair of the Michigan Bean Commission, and Carl Bednarski, President of the Michigan Farm Bureau, "sent a request to the FCIC's Board of Directors requesting that the harvest price be recalculated so that it reflected the actual market price." *Id.* (citing Feb. 16, 2016, Letter, ECF No. 50, Ex. E). That request was denied by the Chairman of the FCIC, Dr. Robert Johansson, on March 8, 2016. *Id.* (citing March 8, 2016, Denial, ECF No. 50, Ex. F). Ackerman subsequently requested "a determination from the RMA and the National Appeals Division (NAD) of the USDA that the March 8, 2016 letter of Dr. Johansson constituted a 'determination made by FCI that is a matter of general applicability [that]

is not subject to administrative review.'" *Id.* at 22–23 (citing 7 C.F.R. 400.91(e)). The RMA

"'decline[d] to render a determination of general applicability . . . because the RMA has not made

any determinations in regard to your client's policy.'" *Id.* at 23 (quoting April 28, 2016, RMA

Letter, ECF No. 50, Ex. G). On June 6, 2016, the NAD sent Ackerman a letter summarizing

Ackerman's request and objections and concluding that "[t]he March 8, 2016, FCIC decision is

not appealable because it establishes program eligibility requirements that are generally applicable

to all participants." NAD Determination, ECF No. 50, Ex. H; Am. Compl. at 23.

Plaintiffs subsequently filed this action. The amended complaint includes three counts. In

the first count, Plaintiffs assert that the

> administrative determinations of the FCIC and RMA of December 15, 2015 and
> March 8, 2016 interpreting the DBRE to require the harvest price to be set equal to
> the projected price . . . were arbitrary, capricious, an abuse of discretion, and not in
> accordance with law; were contrary to statutes and other law; were without
> observance of procedure required by law; and were unwarranted by the facts.

Am. Compl. at 23–24.

In the second count, Plaintiffs contend that "[t]he parties to the [DBRE] contract intended

that the harvest price be set by the RMA based on actual market prices in the event that the harvest

price could not be determined in the manner described in the DBRE." *Id.* at 24. Plaintiffs further

allege that "the RMA and FCIC are required by 7 U.S.C. § 1508(c)(5) to set harvest prices that

reflect actual market prices." *Id.* Plaintiffs allege that

> either the Plaintiffs and Defendant insurance companies both believed and relied
> on the RMA and FCIC's averment that the DBRE in fact provided revenue
> protection insurance coverage to Plaintiffs, or, Plaintiffs unilaterally believed that
> the DBRE provided such coverage and acted in reliance on that belief, while
> Defendant insurers knew that it did not, but accepted payment of DBRE premiums
> by Plaintiffs knowing that there was no DBRE coverage.

*Id.* at 25.

For that reason, they believe that "[t]his mutual mistake or unilateral mistake with fraud necessitates reformation of the DBRE to reflect the intent of the parties at the time of contracting." *Id.*

Finally, in the third count, Plaintiffs allege that "the FCIC and RMA's approval and interpretation of the DBRE subverted the intent and understanding of the parties to the contract, resulting in a complete failure of consideration on the part of Defendant insurance companies by precluding even the possibility of recovery." *Id.* at 26. Additionally, Plaintiffs believe that "allowing Defendant insurance companies to retain the premium paid by the Plaintiffs in the absence of payment of indemnities owed would result in a windfall to Defendant insurance companies and abject inequity." *Id.* For this reason, Plaintiffs ask the Court "to order that the DBRE portion of the parties' contracts be rescinded; and to order (enjoin) Defendant insurance companies to reimburse to Plaintiffs that portion of the premium attributable to the DBRE." *Id.*

## II.

Defendants have moved for dismissal pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). Rule 12(b)(1) provides the means by which a party may assert lack of subject-matter jurisdiction as a defense. "A Rule 12(b)(1) motion for lack of subject matter jurisdiction can challenge the sufficiency of the pleading itself (facial attack) or the factual existence of subject matter jurisdiction (factual attack)." *Cartwright v. Garner*, 751 F.3d 752, 759 (6th Cir. 2014) (citing *United States v. Ritchie*, 15 F.3d 592, 598 (6th Cir.1994)). "A facial attack goes to the question of whether the plaintiff has alleged a basis for subject matter jurisdiction, and the court takes the allegations of the complaint as true for purposes of Rule 12(b)(1) analysis." *Id.* However, a "factual attack challenges the factual existence of subject matter jurisdiction." *Id.* In that case, "the district court has broad discretion over what evidence to consider and may look

- 10 -

outside the pleadings to determine whether subject-matter jurisdiction exists." *Adkisson v. Jacobs Eng'g Grp., Inc*., 790 F.3d 641, 647 (6th Cir. 2015). Regardless, "the plaintiff bears the burden of proving that jurisdiction exists." *DLX, Inc. v. Kentucky*, 381 F.3d 511, 516 (6th Cir. 2004).

A pleading fails to state a claim under Rule 12(b)(6) if it does not contain allegations that support recovery under any recognizable legal theory. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In considering a Rule 12(b)(6) motion, the Court construes the pleading in the non-movant's favor and accepts the allegations of facts therein as true. *See Lambert v. Hartman*, 517 F.3d 433, 439 (6th Cir. 2008). The pleader need not provide "detailed factual allegations" to survive dismissal, but the "obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). In essence, the pleading "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face" and "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678–79 (quotations and citation omitted).

## III.

The Federal Defendants and Insurance Defendants have both filed separate motions to dismiss. The Federal Defendants are seeking dismissal of all contract claims asserted against them, of all claims seeking indemnity from them, and of all Plaintiffs who reside and farm in Minnesota or North Dakota. Fed. Mot. Dismiss, ECF No. 52. The Insurance Defendants seek dismissal of all claims against them for a variety of reasons. Ins. Def. Mot. Dismiss, ECF No. 51. Among other arguments, the Insurers argue that Plaintiffs did not obtain the required FCIC determination of the Insurer's noncompliance with the terms of the policy, that Plaintiffs failed to timely initiate arbitration, that Plaintiffs' state law claims are preempted, that Plaintiffs fail to plead mutual

mistake between Plaintiffs and the Insurers, that venue is improper, and that the amended complaint does not adequately plead subject matter jurisdiction over the Insurers.

First, the threshold issues of jurisdiction, venue, and arbitration will be considered. Then, the question of whether Plaintiffs have stated a claim against the Federal Defendants will be analyzed, followed by a determination of whether Plaintiffs have stated a claim against the Insurance Defendants, if necessary.

## A.

### 1.

#### i.

The Insurance Defendants first argue that the amended complaint does not contain allegations which establish subject matter jurisdiction over them. The Insurers do not appear to contest the existence of subject matter jurisdiction over the Federal Defendants (and the Federal Defendants themselves do not generally contest jurisdiction). Rather, the Insurers note that Plaintiffs rely upon three statutes as establishing jurisdiction. First, Plaintiffs cite 5 U.S.C. § 701, which vests district courts with jurisdiction to review actions by federal agencies. Plaintiffs also cite 28 U.S.C. § 1331, which provides district courts with jurisdiction to adjudicate "civil actions arising under the Constitution, laws, or treaties of the United States." Finally, Plaintiffs rely upon 28 U.S.C. § 1367, which provides:

> in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties.

*Id.* at § 1367(a).

According to the Insurers, "[n]one of these statutes vests jurisdiction in this Court over Defendant Insurers because Plaintiffs do not allege that Defendant Insurers violate a federal law or statute, or otherwise allege any determination made by Defendant Insurers to warrant this Court's jurisdiction." Ins. Mot. Dismiss at 22, ECF No. 51.

There can be no reasonable dispute that the Court possesses subject matter jurisdiction over the Federal Defendants pursuant to 5 U.S.C. § 706 and 28 U.S.C § 1331. Section 706 vests federal district courts with jurisdiction to review and set aside findings and actions of federal agencies if they are found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* at § 706(2)(A). Although the amended complaint is not a paragon of clarity, Count One appears to challenge the "administrative determinations of the FCIC and RMA . . . [as] contrary to law." Am Compl. at 24. The Court thus has original jurisdiction over the Federal Defendants, and the question becomes whether the Court possesses supplemental jurisdiction over the Insurance Defendants.

Plaintiffs argue that the Insurance Defendants are parties which must be joined in the action in order for Plaintiffs to obtain full relief, and so supplemental jurisdiction exists. That is essentially correct. The gravamen of Plaintiffs' claims is that they paid premiums to the Insurance Defendants but did not receive corresponding coverage. The reason Plaintiffs did not receive the anticipated coverage is traceable to decisions made by the Federal Defendants. Accordingly, Plaintiffs can prevail against the Insurance Defendants only if they prevail against the Federal Defendants. Similarly, because Plaintiffs contracted with the Insurers and not with the Federal Defendants for the crop insurance, Plaintiffs are limited to seeking monetary remedies for the alleged breach of contract against the Insurers only. Given the interrelationship between the Insurance Defendants, the Federal Defendants, and the relief requested, Plaintiffs' claims against

the Insurers "form part of the same case or controversy." § 1367(a). The Court accordingly has supplemental jurisdiction over the Insurers.

**ii.**

The Insurance Defendants also argue, in vague terms, that the Plaintiffs have not established Article III standing because they have not "allege[d] that Defendant Insurers caused them to suffer an actual concrete and particularized injury." Ins. Mot. Dismiss at 23–24. This threadbare argument has no merit. Claims of overpayment, wherein a plaintiff paid a premium but did not receive the anticipated consideration, are cognizable injuries in fact. *See Wuliger v. Manufacturers Life Ins. Co.*, 567 F.3d 787, 794 (6th Cir. 2009). *See also Danvers Motor Co. v. Ford Motor Co.*, 432 F.3d 286, 293 (3d Cir. 2005) ("Monetary harm is a classic form of injury-in-fact.").

The Insurers do not expressly argue that Plaintiffs' injury is not traceable to their actions, but the Court has an independent duty to ensure that the alleged injury was caused by the named Defendants. Causation exists if the injury is one "that fairly can be traced to the challenged action of the defendant." *Simon v. E. Kentucky Welfare Rights Org.*, 426 U.S. 26, 41 (1976). Plaintiffs are challenging administrative determinations made by the Federal Defendants, and so at first glance the alleged injury does not appear to have been caused by the Insurers. As to the Federal Defendants, Plaintiffs' alleged injury is the adverse determination regarding the harvest price.

Plaintiffs, however, are alleging that the Insurance Defendants injured them in a different way. Plaintiffs are advancing (essentially) breach of contract claims against the Insurers: Plaintiffs entered into a contract with the Insurers for revenue protection, but did not receive that revenue protection despite paying a premium for it. The dispositive question—whether a breach of contract occurred—will turn on whether the Federal Defendants properly calculated the harvest price. If

the harvest price was properly calculated, then the Insurers did not breach the contract. If it was not, then the Insurers breached the contract. In other words, Plaintiffs' alleged injury stems from the Insurer's breach of contract. Proof that the Federal Defendants acted arbitrarily and capriciously will further demonstrate that the Insurance Defendants breached their contracts. Thus, although the *means* by which the alleged injuries are proven is the same, the alleged injuries are different for each class of Defendants.

To restate, Plaintiffs' alleged injury with respect to the Insurers is *not* that the Federal Defendants improperly determined the harvest price. If that was the alleged injury, Plaintiffs would lack standing to sue the Insurers. Rather, Plaintiffs' alleged injury regarding the Insurers is their refusal to indemnify them. That decision was made by the Insurers, and so is directly traceable to the Insurers. The question of whether that refusal actually constituted a breach of contract will turn on whether the Federal Defendants violated the law in determining the harvest price. Plaintiffs may not ultimately succeed in demonstrating that the harvest price was improperly calculated, but having a valid claim on the merits is not a predicate to standing. *See Wuliger v. Manufacturers Life Ins. Co.*, 567 F.3d 787, 796 (6th Cir. 2009) ("[T]he causation requirement in standing is not focused on whether the defendant 'caused' the plaintiff's injury in the liability sense; the plaintiff need only allege injury that fairly can be traced to the challenged action of the defendant, and not injury that results from the independent action of some third party not before the court.") (internal citations and quotations omitted); *Gregory v. CitiMortgage, Inc.*, 890 F. Supp. 2d 791, 797–98 (E.D. Mich. 2012) ("'[H]aving standing to bring a claim does not mean you have a valid claim on the merits.'") (quoting *Langley v. Chase Home Finance, LLC*, No. 10–604, 2011 WL 1130926, at *2 n. 2 (W.D. Mich. Mar. 28, 2011)). Because Plaintiffs have alleged injuries which are traceable to each Defendant, Article III standing exists.

**2.**

The Defendants additionally argue that all Plaintiffs who reside in Minnesota or North Dakota should be dismissed for lack of jurisdiction. *See* Fed. Mot. Dismiss at 14, ECF No. 52 ("[T]his Court has jurisdiction over only those plaintiffs who farming [sic] in the Eastern District of Michigan."); Ins. Mot. Dismiss at 24 (arguing that the Court should dismiss all allegations relating to farmers in North Dakota because "not one of the Plaintiffs is alleged to have grown dark red kidney beans in North Dakota" and so the plaintiffs have not established standing to bring related claims).

The Insurers argue that the Plaintiffs do not have standing to advance claims on behalf of unnamed farmers in North Dakota. Because Plaintiffs are alleging a putative class action, the fact that no named Plaintiff farms in North Dakota does not necessitate dismissal of all potential class members from North Dakota. The "growing consensus" of courts have concluded that, if the named Plaintiffs have standing to sue, then claims advanced on behalf of unnamed Plaintiffs should not be dismissed for lack of standing at the pleading stage. *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 831 (1999) (collecting cases). The question of whether the state law claims may be advanced on behalf of unnamed Plaintiffs is indistinguishable from the Federal Rule of Civil Procedure 23 analysis. *See Kaatz*, 2016 WL 3676697, at *4 ("That standing inquiry is more appropriately addressed at the class certification stage when courts consider the commonality and typicality prerequisites of class actions.") Accordingly, "where 'class certification is the source of the potential standing problems,' class certification should precede the standing inquiry." *In re Digital Music Antitrust Litig.*, 812 F. Supp. 2d 390, 406 (S.D.N.Y. 2011) (quoting *In re Grand Theft Auto Video Game Litig.*, No. 06 MD 1739, 2006 WL 3039993, at *2 (S.D.N.Y. Oct. 25, 2006)).

The Federal Defendants' argument, however, is not focused on standing. Rather, they contend that Congress has waived sovereign immunity only for claims brought by farmers who reside in Michigan. The Federal Defendants' argument is premised on the language of the Federal Crop Insurance Act, 7 U.S.C. § 1506(d). That provision provides that the "district courts of the United States, including the district courts of the District of Columbia and of any territory or possession, shall have exclusive original jurisdiction, without regard to the amount in controversy, of all suits brought by or against the Corporation." *Id.* That same section continues: "Any suit against the Corporation shall be brought in the District of Columbia, or in the district wherein the plaintiff resides or is engaged in business." *Id.*

The Federal Defendants admit that Congress has vested federal district courts with exclusive authority over suits against the FCIC, but argue that "[a] condition is placed on such suits, however, because they must be brought either whether [sic] the plaintiff resides or does business, or in the District of Columbia." Fed. Reply Br. Mot. Dismiss at 4–5, ECF No. 62. Plaintiffs argue that the "condition" which the Federal Defendants identify governs venue and is not jurisdictional. Pl. Resp. Fed. Mot. Dismiss at 16, ECF No. 59.

The Federal Defendants have not identified any legal authority which interprets § 1506(d) or characterizes the nature of the sentence which indicates where suits should be brought. Rather, the Federal Defendants simply rely upon generalized authority regarding the United States' sovereign immunity from suit. It is true that "the United States, as sovereign, 'is immune from suit save as it consents to be sued . . . and the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit.'" *United States v. Testan*, 424 U.S. 392, 399 (1976) (quoting *United States v. Sherwood*, 312 U.S. 584, 586 (1941)). Accordingly, the "'limitations and conditions upon which the Government consents to be sued must be strictly observed and

exceptions thereto are not to be implied.'" *Lehman v. Nakshian*, 453 U.S. 156, 161 (1981) (quoting *Soriano v. United States*, 352 U.S. 270, 276 (1957)).

The Federal Defendants assume without explanation that Congress meant § 1506(d) to waive the United States' immunity only for suits "brought in the District of Columbia, or in the district wherein the plaintiff resides or is engaged." And that assumption is unwarranted. To begin with, it is inconsistent with the plain language of § 1506(d). As stated above, that provision includes a sentence expressly vesting "exclusive original jurisdiction" in the "district courts of the United States." *Id.* That grant of jurisdiction does not include qualifying language. Several sentence later, § 1506(d) then specifies *where* suits against the Corporation should be brought. If the second sentence was meant to confine district court jurisdiction, the first sentence is rendered redundant.

More importantly, no cases have been identified which interpret the last sentence in § 1506(d) as a jurisdictional limitation. To the contrary, the few cases which consider that issue have uniformly found that the last sentence of § 1506(d) governs venue. *See Granite Reinsurance Co. v. Frohman*, No. 8:08CV410, 2009 WL 3643181, at *1 (D. Neb. Oct. 26, 2009) (granting a motion to transfer to the District of Columbia after concluding that to be "the proper venue" and citing § 1506(d)); *Granite Reinsurance Co. v. Frohman*, No. 8:08CV410, 2009 WL 2601105, at *7 (D. Neb. Aug. 17, 2009) (explaining that the last sentence of § 1506(d) "addresses venue, not subject matter jurisdiction"); *Crop Hail Mgmt. v. Fed. Crop Ins. Corp.*, No. 2:91CV10-B-O, 1994 WL 1890927, at *2 (N.D. Miss. Oct. 7, 1994) (concluding, in a suit involving plaintiffs from three different districts, that venue existed in each district under § 1506(d) or § 1508(f)). *See also In re Peanut Crop Ins. Litig.*, 524 F.3d 458, 468 (4th Cir. 2008) (explaining that a variety of class action lawsuits from a variety of states involving peanut crop insurance were consolidated in the Eastern

District of North Carolina pursuant to the recommendation of a multi-district litigation panel); *Phillips v. Rubin*, 76 F. Supp. 2d 1079, 1081 (D. Nev. 1999) (rejecting the "novel argument that the United States has not waived sovereign immunity under Title VII with respect to suit in an improper venue" because "venue is not jurisdictional").

Thus, the final sentence of § 1506(d) does not impose a jurisdictional limitation. Rather, it provides guidance in determining the proper venue for suits against the FCIC. "The general rule [for class actions] is that only the residence of the named parties is relevant for determining whether venue is proper." 7A Charles Alan Wright and Arthur R. Miller, *Personal Jurisdiction and Venue*, 7A Fed. Prac. & Proc. Civ. § 1757 (3d ed.). *See also Cook v. UBS Fin. Servs., Inc.*, No. 05 CIV. 8842 (SHS), 2006 WL 760284, at *3 (S.D.N.Y. Mar. 21, 2006); *Ring v. Roto-Rooter Servs. Co.,* No. 1:10-CV-179, 2010 WL 3825390, at *4 (S.D. Ohio Sept. 28, 2010). Here, the named Plaintiffs include three farmers from Minnesota. Am. Compl. at 7, 9, 10. The language of § 1506(d) indicates that those Plaintiffs must bring suit in the District of Minnesota or in the District of Columbia. Similarly, several named Plaintiffs allege that they farm in Michigan but do not specifically assert that they farm in the Eastern District. Pursuant to § 1506(d), those Plaintiffs must bring suit in the district where they conduct business. The Plaintiffs who are suing in the wrong venue under § 1506(d) will be dismissed without prejudice.

At this stage, the parties have not briefed the question of whether Plaintiffs who farm in the Eastern District of Michigan may advance class action claims on behalf of farmers from outside the district. That question is subsumed in the class certification analysis and will be reserved until then.[1]

---

[1] The Insurance Defendants argue that they should be dismissed because the Plaintiffs have not identified *any* basis for venue as to them. In making this argument, the Insurers noted that § 1506(d) appears to govern venue only in suits against the "Corporation," not against private insurers. Assuming § 1506(d) to be inapplicable, that means that the general federal venue statute, 28 U.S.C. § 1391 applies. Section 1391(b) provides that venue exists in "a judicial

**3.**

The Insurance Defendants argue that the claims against them should be dismissed because the Plaintiffs did not timely initiate arbitration as is required by the Basic Provisions of the Common Crop Insurance Act. Plaintiffs do not contest that the Common Crop Insurance Policy contains an arbitration provision, but contend that it is inapplicable because the "Defendant insurers have not made any determination with respect to the DBRE." Pl. Resp. Ins. Mot. Dismiss at 13.

**i.**

The Federal Arbitration Act ("FAA") governs requests to enforce arbitration agreements. The FAA was enacted in response to the hostility of American courts to enforcing arbitration agreements and constituted an effort to place arbitration agreements upon the same footing as other contracts. *See Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 11 (2001). Section 2 of the FAA provides:

> A written provision in any… contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction…shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2.  "By its terms, the Act leaves no place for the exercise of discretion by a district court, but instead mandates that district courts shall direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." *Dean Witter Reynolds, Inc. v. Byrd*,

---

district in which any defendant resides, if all defendants are residents of the State in which the district is located." *Id.* at § 1391(b)(1). Because the Insurance Defendants reside in many different states, § 1391(b)(1) is inapplicable. Section 1391(b)(2) creates venue in "a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of the property that is the subject of the action is situated." *Id.* Here, the large majority of the named Plaintiffs farm in Michigan, and so the insurance contracts at issue were entered into in Michigan. In other words, the named Plaintiffs have established venue over the Insurance Defendants.

470 U.S. 213 218, (1985) (citing 9 U.S.C. §§ 3–4). An arbiter's power to hear claims does not arise from law governing jurisdiction, but from the contract of the parties.

The pertinent question, then, is whether there is a valid agreement between the parties and whether the specific dispute falls within the substantive scope of the agreement. *Andrews v. TD Ameritrade, Inc.*, 596 Fed. App'x 366, 370 (6th Cir. 2014). "Because arbitration agreements are fundamentally contracts, [courts] review the enforceability of an arbitration agreement according to the applicable state law of contract formation." *Seawright v. Am. Gen. Fin. Servs., Inc.*, 507 F.3d 967, 972 (6th Cir.2007) (citing *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 943-44 (1995)). "The federal policy favoring arbitration, however, is taken into account even in applying ordinary state law." *Cooper v. MRM Inv. Co.*, 367 F.3d 493, 498 (6th Cir. 2004). The party seeking to enforce a contract has the burden of showing that it exists. *See Kamalnath v. Mercy Mem'l Hosp. Corp*, 487 N.W.2d 499, 504 (Mich. App. 1992).

Federal courts have consistently held that the arbitration provisions of the Basic Provisions of the Common Crop Insurance Policy are valid and enforceable under the FAA. *See Bissette v. Rain & Hail, L.L.C.*, No. 5:10-CV-40-D, 2011 WL 3905059, at *2 (E.D.N.C. Sept. 2, 2011) ("Mandatory arbitration provisions in crop insurance policies are valid and enforceable."); *Wardlaw v. Rural Cmty. Ins. Servs.*, No. 1:10-CV-01004, 2010 WL 4259792, at *2 (W.D. Ark. Sept. 27, 2010), report and recommendation adopted, No. 1:10-CV-01004, 2010 WL 4235662 (W.D. Ark. Oct. 21, 2010); *Nobles v. Rural Cmty. Ins. Servs.*, 122 F. Supp. 2d 1290, 1295 (M.D. Ala. 2000). Plaintiffs do not dispute that a valid agreement to arbitrate exists, they simply argue that the present dispute does not fall within the scope of that agreement.

Section 20 of the Basic Provisions is entitled "Mediation, Arbitration, Appeal, Reconsideration, and Administrative and Judicial Review." Section 20(a) provides:

If you and we fail to agree on any determination made by us except those specified in section 20(d) or (e),[2] the disagreement may be resolved through mediation in accordance with section 20(g). If resolution cannot be reached through mediation, or you and we do not agree to mediation, the disagreement must be resolved through arbitration in accordance with the rules of the American Arbitration Association (AAA), except as provided in section 20(c) and (f), and unless rules are established by the FCIC for this purpose.

Id.

Section 20(a)(1) provides further guidance:

All disputes involving determinations made by us, . . . are subject to mediation or arbitration. However, if the dispute in any way involves a policy or procedure interpretation, regarding whether a specific policy provision or procedure is applicable to the situation, how it is applicable, or the meaning of any policy provision or procedure, either you or we must obtain an interpretation from the FCIC in accordance with 7 CFR part 400, subpart X or such other procedures as established by the FCIC.

(i)     Any interpretation by FCIC will be binding in any mediation or arbitration.
(ii)    Failure to obtain any required interpretation from FCIC will result in the nullification of any agreement or award.
(iii)   An interpretation by FCIC of a policy provision is considered a determination that is a matter of general applicability.
(iv)    An interpretation by FCIC of a procedure may be appealed to the National Appeals Division in accordance with 7 CFR part 11.

Id.

Section 20(b) sets forth the timeline for arbitration and judicial review. Pursuant to §

20(b)(1), the "initiation of arbitration proceedings must occur within one year of the date we denied

your claim or rendered the determination with which you disagree, whichever is later." If the

farmer fails "to initiate arbitration in accordance with section 20(b)(1) and complete the process,

---

[2] Neither of these sections are implicated on the present facts. Section 20(d) involves decisions regarding what constitutes "good farming practices" and section 20(e) applies when the farmer disagrees "with any other determination made by FCIC or any claim where the FCIC is directly involved in the claims process or directs us in the resolution of the claim." Although Plaintiffs are challenging a determination by the FCIC, that determination involved a "matter of general applicability," which means that § 20(k) applies instead of § 20(e). Section 20(e) requires farmers to seek administrative review or appeal of the FCIC's determination, but § 20(k) merely requires farmers to obtain "a determination of non-appealability from the Director of the National Appeals Division . . . before seeking judicial review."

[the farmer] will not be able to resolve the dispute through judicial review." *Id.* at § 20(b)(2). Pursuant to § 20(k),

> Any determination made by FCIC that is a matter of general applicability is not subject to administrative review under 7 CFR part 400, subpart J or appeal under 7 CFR part 11. If you want to seek judicial review of any FCIC determination that is a matter of general applicability, you must request a determination of non-appealability from the Director of the National Appeals Division in accordance with 7 CFR 11.6 before seeking judicial review.

*Id.*

### ii.

Plaintiffs argue that their claims against the Insurance Defendants are not subject to the arbitration agreement because the "Insurers have not made any determination with respect to the DBRE." Pl. Resp. Ins. Mot. Dismiss at 13. Because they are challenging the FCIC's calculation of the harvest price, Plaintiffs contend that § 20(k) applies instead of § 20(a).

This argument is based on a misapprehension of how § 20(a) and § 20(k) interrelate. Plaintiffs correctly argue that they are challenging a determination on a matter of general applicability by the FCIC. That challenge forms the basis for their Administrative Procedures Act claims against the Federal Defendants. And, pursuant to § 20(k), Plaintiffs can seek judicial review of that determination after obtaining a "determination of non-appealability." *Id.* Plaintiffs do not need to seek arbitration on that claim. In fact, because the Federal Defendants were not parties to the insurance contracts, the arbitration agreement is not enforceable by or against the Federal Defendants. *See Olsen v. U.S. ex rel. U.S. Dep't of Agric.*, 546 F. Supp. 2d 1122, 1126 (E.D. Wash. 2008) ("[T]he Court finds that the FCIC was a party to neither the Policies nor the arbitration agreements they contain."). *See also Olsen v. U.S. ex rel. Fed. Crop Ins. Corp.*, 334 F. App'x 834, 835 (9th Cir. 2009) ("[T]he FCIC was not a party to the contract containing the arbitration clause,

and because the arbitration provision makes clear that disagreements with the FCIC must be resolved through the administrative appeals process.").

However, the fact that Plaintiffs are challenging a FCIC determination on a matter of general applicability does not relieve Plaintiffs of the arbitration agreement as to their claims against the Insurers. A review of § 20(a) and (b) makes this distinction clear. Section 20(a)(1) specifies that "if the dispute in any way involves a policy or procedure interpretation, . . . either you or we must obtain an interpretation from FCIC." The same section indicates that "[a]n interpretation by FCIC of a policy provision is considered a determination that is a matter of general applicability." *Id.* at § 20(a)(1)(iii). Considered in context, these sections make clear that even if the dispute between a farmer and insurer "in any way involves" a matter of general applicability, the farmer must nevertheless arbitrate that dispute with the insurer.

Here, and as explained above, Plaintiffs are advancing two separate but related theories of harm. First, they argue that the Federal Defendants violated the APA when they calculated the harvest price as identical to the projected price. Second, they argue that the Insurance Defendants violated the insurance agreements when, in reliance on the FCIC's harvest price determination, they refused to provide indemnification for the revenue losses Plaintiffs sustained in 2015. Accordingly, Plaintiffs' argument that "Defendant insurers have not made any determination" is inaccurate. Plaintiffs are suing the Insurers for their refusal to indemnify them. Admittedly, that dispute "involves a policy or procedure interpretation," but § 20(a)(1) is clear that arbitration is mandatory even in that situation.[3] *See Bottoms Farm P'ship v. United States Dep't of Agric.*, No.

---

[3] Note that an earlier version of the Basic Provisions limited the mandatory arbitration to disputes about "any factual determination." *See, e.g., Nobles v. Rural Cmty. Ins. Servs.*, 122 F. Supp. 2d 1290, 1295 (M.D. Ala. 2000). The present version of the Basic Provisions (which Plaintiffs entered into) does not contain the word "factual." This change further mandates the conclusion that the insurance policies mandate arbitration even for disputes involving "legal determinations."

4:15-CV-1073-SPM, 2017 WL 1105124, at *12 (E.D. Mo. Mar. 24, 2017) (explaining that § 20(a)(1) "contains no qualifying language to suggest that the obligation to obtain an interpretation from FCIC, or the binding nature of that interpretation, is limited to situations in which FCIC has issued any particular type of procedures for issuing the interpretation").

Plaintiffs admit that they have not arbitrated their claims against the Insurance Defendants. Indeed, because Plaintiffs' claims and requested relief as to the Insurance Defendants requires success on their claims against the Federal Defendants, any request for arbitration would be premature. As the Insurers note, more than a year has passed since the Insurers denied Plaintiffs' claims for indemnity. Pursuant to § 20(b)(1), then, Plaintiffs have missed the opportunity to seek arbitration, unless they can identify some other "determination with which [Plaintiffs] disagree" within the past year. If Plaintiffs prevail upon their claims against the Federal Defendants and the Insurance Defendants nevertheless refuse to indemnify Plaintiffs, perhaps that refusal would constitute a "determination" under § 20(b)(1) sufficient to trigger a new one year period of limitations. That issue has not been briefed and is unripe. For that reason, the Court declines to opine on whether Plaintiffs would be barred from arbitration and thus judicial review pursuant to § 20(b)(1) and (2).

### iii.

"[A]n enforceable contractual right to compel arbitration operates as a quasi-jurisdictional bar to a plaintiff's claims, providing grounds for dismissal of the suit." *Johnson Assocs. Corp. v. HL Operating Corp.*, 680 F.3d 713, 718 (6th Cir. 2012). Because any claims Plaintiffs may have against the Insurance Defendants would be subject to § 20(a) and (b), the remaining question is whether Plaintiffs' claims against the insurers should be dismissed or stayed.

The Sixth Circuit uses a four factor test to determine if a case should be dismissed or stayed and arbitration compelled: (1) whether the parties agreed to arbitrate; (2) the scope of the agreement to arbitrate; (3) if federal statutory claims are involved, whether Congress intended for those claims to be arbitrable; and (4) if only some of the claims are subject to arbitration, whether the nonarbitrable claims should be stayed pending arbitration. *Fazio v. Lehman Bros., Inc.*, 340 F.3d 386, 392 (6th Cir. 2003). "The Arbitration Act establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25 (U.S. 1983).

In this case, dismissal without prejudice is the best option. As explained above, any claims which Plaintiffs may have against the Insurance Defendants are either untimely (because no arbitration was sought within the year after indemnity was denied) or unripe (because Plaintiffs must first establish that the Federal Defendants improperly calculated the harvest price for 2015). Either way, a stay of the claims against the Insurers would be futile. Accordingly, Plaintiffs' claims against the Insurance Defendants will be dismissed without prejudice.[4]

## B.

The Federal Defendants seek partial dismissal of the claims against them. First, the Federal Defendants argue that all contract claims which Plaintiffs appear to advance against them should be dismissed because no privity of contract exists between Plaintiffs and the Federal Defendants.

---

[4] As the Insurers argue, Plaintiffs' claims for damages against the Insurers would also be barred pursuant to § 20(i). That section provides that claimants may recover damages from insurers "only if [the claimants] obtain a determination from FCIC that [the insurers] failed to comply with the terms of this policy or procedures issued by FCIC." *Id.* Plaintiffs attempt to argue that their suit is not barred because they are seeking only "the indemnity owed under the insurance policy." Pl. Resp. Ins. Mot. Dismiss at 12. That argument is directly rejected by the plain language of § 20(i), which provides that a farmer may "recover . . . punitive, *compensatory*, or any other damages . . . only if you obtain a determination from the FCIC." Plaintiffs are clearly alleging that they "receive[d] a payment in an amount that is less than the amount to which [they] were entitled." *Id.* at § 20(i) (emphasis added). Plaintiffs seek compensation for that underpayment. Thus, Plaintiffs are seeking *compensatory* damages. Their claims are barred because they have not sought a determination from the FCIC of noncompliance.

Second, they argue that Plaintiffs' claims against them in Counts Two and Three are untimely to the extent they involve claims for indemnity.

As to the first argument, Plaintiffs admit that "there was no privity of contract between the Federal Defendants and Plaintiffs." Pl. Resp. Fed. Mot. Dismiss at 11, ECF No. 59. Rather, Plaintiffs explain that their claims against the Federal Defendants arise out of the Administrative Procedures Act. Plaintiffs also explain that Count Three is being advanced only against the Insurance Defendants. *Id.* at 15. Plaintiffs respond to the second argument by admitting that claims for indemnity under 7 U.S.C. § 1508(j) is subject to a one year statute of limitations. They acknowledge that they are not advancing claims for indemnity against the Federal Defendants. Rather, their claims arise under the APA and contend that "the interpretation and approval by the Federal Defendants of the DBRE was arbitrary and capricious." *Id.* Because the statute of limitations for claims under the APA is six years, Plaintiffs argue that there is no statute of limitations bar for their claims against the Federal Defendants.

Given Plaintiffs' concessions, the Federal Defendants' motion to dismiss will be granted. For clarity, all claims against the Federal Defendants not arising out of the APA will be dismissed without prejudice. Similarly, Count Three will be dismissed in full without prejudice because Plaintiffs admit that it is not being advanced against the Federal Defendants.

## C.

The final matter to resolve is Plaintiffs' motion for leave to file a second amended complaint. ECF No. 64. In the motion, Plaintiffs indicate that they wish to correct clerical errors in the names of seven Plaintiffs and substitute "Ackerman & Sons LLC" for "Greg Ackerman." Mot. Amend at 1. In their responses, the Defendants indicate that they do not oppose the amendment, but do not waive the defenses articulated in their motions to dismiss. Because those

motions will be granted, Plaintiffs' motion to amend will likewise be granted. Plaintiffs will be directed to file a second amended complaint which incorporates the changes to the named Plaintiffs identified in the motion and further reflects the dismissal of claims and parties effectuated in this Order.

## IV.

Accordingly, it is **ORDERED** that the Insurance Defendants' motion to dismiss, ECF No. 51, is **GRANTED.**

It is further **ORDERED** that the Insurance Defendants are **DISMISSED without prejudice.**

It is further **ORDERED** that the Federal Defendants' motion to dismiss in part, ECF No. 52, is **GRANTED.**

It is further **ORDERED** that all claims against the Federal Defendants not arising out of the Administrative Procedures Act are **DISMISSED without prejudice.**

It is further **ORDERED** that Count III of the amended complaint is **DISMISSED without prejudice.**

It is further **ORDERED** that all Plaintiffs who do not reside or farm in the Eastern District of Michigan are **DISMISSED without prejudice.**

It is further **ORDERED** that Plaintiffs' motion for leave to file a second amended complaint, ECF No. 64, is **GRANTED.**

It is further **ORDERED** that Plaintiffs are **DIRECTED** to file a second amended complaint **on or before April 30, 2018.** The second amended complaint should incorporate the dismissals reflected in this Order. Specifically, the second amended complaint should include only

the Federal Defendants and should only advance claims under the Administrative Procedures Act.

The named Plaintiffs should all reside or farm in the Eastern District of Michigan.

Dated: April 18, 2018                                    s/Thomas L. Ludington
                                                         THOMAS L. LUDINGTON
                                                         United States District Judge

PROOF OF SERVICE

The undersigned certifies that a copy of the foregoing order was served
upon each attorney or party of record herein by electronic means or first
class U.S. mail on April 18, 2018.

                        s/Kelly Winslow
                        KELLY WINSLOW, Case Manager