**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| RICH ELBERT; JEFF A. KOSEK; REICHMANN LAND & CATTLE LLP; LUDOWESE A.E. INC.; and MICHAEL STAMER; *individually and on behalf of a class of similarly situated persons* | Civil No. 18-1574 (JRT/TNL) |
| Plaintiffs, | **MEMORANDUM OPINION AND ORDER GRANTING SUMMARY JUDGMENT FOR DEFENDANTS** |
| v. | |
| UNITED STATES DEPARTMENT OF AGRICULTURE, RISK MANAGEMENT AGENCY, and FEDERAL CROP INSURANCE CORPORATION, | |
| Defendants. | |

John D. Tallman, **JOHN D. TALLMAN, PLLC**, 4020 East Beltline Ave. NE, Suite 101, Grand Rapids, MI, for plaintiffs.

David W. Fuller, Assistant United States Attorney, **UNITED STATES ATTORNEY'S OFFICE,** 300 South Fourth St., Suite 600, Minneapolis, MN 55415, for defendants.

In the fall of 2015, dark-red kidney-bean farmers in Minnesota found that harvest prices had fallen significantly from what they had expected that spring. Although the farmers had purchased revenue insurance designed to protect against a fall in bean prices, they were unable to collect because there were not enough published pricing data to establish a harvest price, per the insurance policy. Instead, the famers were left with

only yield protection, which offered no relief for the drop in market price. The farmers brought claims under the Administrative Procedure Act ("APA") against Defendants—the United States Department of Agriculture ("USDA"); the Risk Management Agency ("RMA"); and the Federal Crop Insurance Corporation ("FCIC") (collectively, the "Agencies")—arguing that (1) it was arbitrary and capricious for Defendants to approve the insurance policy; and that (2) it was arbitrary and capricious of the Risk Management Agency not to step in and reform the policy when the pricing mechanism failed.

Because Plaintiffs were not parties or privies to a similar case in the United States District Court for the Eastern District of Michigan when that court granted summary judgment for Defendants, they are not precluded from litigating their case here, and the Court will deny Defendants' Motion to Dismiss. However, although the insurance policy was seriously flawed and resulted in significant losses to the farmers, Plaintiffs have not demonstrated that Defendants' actions were arbitrary and capricious. Because Defendants reasonably interpreted the language of the Dry Bean Revenue Endorsement (the "Endorsement"), because the Risk Management Agency was not obligated to use any equitable powers it might have, and because Defendants reasonably approved the insurance program having considered the potential pricing risks, the Court will grant Defendants' Motion for Summary Judgment and will deny Plaintiffs' Motion for Summary Judgment.

## BACKGROUND

### I.    MINNESOTA DARK-RED KIDNEY-BEAN FARMERS

Plaintiffs Rich Elbert, Jeff Kosek, Reichmann Land & Cattle LLP, Ludowese A.E. Inc., and Michael Stamer farm dark-red kidney beans in Minnesota.[1]  In 2015, these farmers purchased crop insurance, including a Dry Bean Revenue Endorsement (the "Endorsement.")  (FCIC987-991, Docket No. 116, # 34.)[2]  The Endorsement was an add-on that allowed farmers to pay additional premiums to insure against crop-price declines, as measured between the spring "projected price" and the fall "harvest price."  Revenue insurance like this, which protects against price declines, had not previously been available prior to 2012.  Instead, only yield protection, which protects against crop failures, had been available to dry-bean farmers.  (*Id.* at FCIC848.)

In 2015, the prices for dark-red kidney beans dropped sharply at harvest time. However, the farmers did not receive revenue protection for the price drop.  Instead, due to a lack of reported price data, the harvest price was set at the same level as the projected price, and not the actual market price.  As a result, because the harvest price

---

[1] Neither party provides any citations for the basic facts of the case, despite the 15,000-page administrative record.  However, because the parties appear to agree on these facts, the Court may consider them undisputed for the purposes of these Motions.  *See* Fed. R. Civ. P 56 (e)(2).

[2] Citations to the Administrative Record are paginated with the original FCIC numbering for ease of review, and include reference to the Exhibit Number within each Docket Number 116-122.) The Administrative Record was certified as containing "those documents considered by the decision-maker."  (Decl. of Zachary White, Aug. 14, 2019, Docket No. 115.)

was now the same as the projected price, there was no differential, and the farmers did not recover any insurance money.

## II.     FEDERAL CROP INSURANCE POLICY

Crop insurance comes in many varieties, including yield protection and revenue protection  Yield protection provides "protection against a production loss."  7 C.F.R. § 457.8 (Common Crop Insurance Policy).  Revenue protection provides "protection against loss of revenue due to a production loss, price decline or increase, or a combination of both."  *Id.*

The Federal Crop Insurance Corporation provides reinsurance for approved private crop-insurance providers.  (FCIC39, Docket No. 116, # 1.)  To submit a policy, a private-party applicant prepares the policy documents, premium rates, prices, and submits the documents to Defendants.  A policy "shall be approved" if Defendants find that the plan adequately protects the interest of producers and any premiums charged are actuarily appropriate.  7 U.S.C. § 1508(h)(3).  (FCIC239, Docket No. 116, # 3.)

These private crop-insurance policies operate in accordance with, and may modify, the Common Crop Insurance Policy Basic Provisions (the "Basic Provisions") and the Dry Bean Crop Provisions, which are set out in federal regulations.  7 C.F.R. §§ 457.8, 457.150. (FCIC308-359, Docket No. 116, #5-6.)

The Basic Provisions state in the preamble that "We will use the procedures (handbooks, manuals, memoranda and bulletins), as issued by the FCIC and published on

the RMA's Web site at http://rma.usda.gov or a successor Web site, in the administration of this policy, including the adjustment of any loss or claim submitted hereunder." Common Crop Insurance Policy, 7 C.F.R. § 457.8.  (FCIC310, Docket No 116, #5.)

The Office of Risk Management has jurisdiction to supervise the Federal Crop Insurance Corporation, and additionally has jurisdiction over "[a]ny pilot or other programs involving revenue insurance . . . that may be established under the Federal Crop Insurance Act or other law."  7 U.S.C. § 6933.

## III.    WATTS' POLICY

### A.  Initial Proposal

The policy at issue in this case was developed and submitted by Watts and Associates, Inc., an economic consulting firm; the Northarvest Bean Growers Association; and the USA Dry Pea and Lentil Council (collectively, "Watts"), in October and November 2011.  (FCIC827, Docket No. 116, # 34.)  The policy was titled the Pulse Crop[3] Revenue Coverage Pilot Program ("the Proposal").  (*Id.*)  The Proposal explained that pulse-crop farmers wanted, but did not have access to, revenue coverage for their crops.  (*Id.*)  The Proposal explained that because such revenue coverage had previously been unavailable, pulse crops were at a competitive disadvantage over crops for which revenue coverage was available.  (*Id.*)

---

[3] A pulse crop is a legume which is harvested for its dry seed, and the category includes dried beans, lentils, and peas.

Other revenue-insurance products use futures markets to help determine prices but, because there is no futures market for pulse crops, Watts had to develop a new pricing methodology. (*Id.* at 873-75.) Watts proposed to set the projected price for the crops by obtaining the contract prices from processors in January and February. (*Id.* at 875.) Watts explained that "the approximate contracting volume of the processors is known and processors are willing to share their contract price" and attached several letters from processors committing their support. (*Id.*) Watts explained that the projected price would be the average of these contract prices for each particular pea and bean type. (*Id.*)

As for the harvest price, Watts explained that determining "the best mechanism for establishing harvest price has constituted a major component of the development process." (*Id.*) For dry beans, Watts explained that the AMS Bean Market News publishes weekly sales-price data for each bean type in the region. (*Id.* at 903.) The AMS collected these prices via a telephone survey of regional processors based on weekly cash sales. (*Id.* at 1150, 875-76.) Watts noted that an "analysis of historical actual producer prices [attached to the Proposal] clearly demonstrates that AMS data provide a strong measure of harvest price." (*Id.* at 876.) The draft insurance provisions that accompanied the submission explained that:

> In lieu of section 3(c)(5) of the Basic Provisions:[4] . . . (2) If the harvest price as defined cannot be calculated for the crop year for a type for which a projected price was determined in accordance with the definition: (i) A harvest price will be determined and announced by FCIC in lieu of the terms contained in the definition of harvest price.

(*Id.* at 988.)  However, in the "Rating Methods" section of the Proposal, Watts notes that:

> there have been occasions in recent years where AMS has failed to report prices for some types during the September through November marketing period.  Missing observations are generally due to thin market volume, but there may be other causes as well.  For example, the 2008 MN/ND black bean price was reported for September but not October or November; the 2008 MN/WI dark red kidney price was not reported for any of the months September through November.  If AMS prices are to be used as part of the insurance policy, contingency procedures will need to be developed to handle situations where AMS prices are not available.  The developer recommends that the projected price be substituted for any missing AMS monthly harvest price observations.

(*Id.* at 887, 894.)

## B.  Agency Questions

After reviewing Watts's submission, the RMA wrote to Watts with questions and comments.  (FCIC1175, Docket No. 116, #36.)  Among other things, the RMA repeated

---

[4] Section 3(c)(5) of 11-BR (the Basic Provisions of the crop insurance policy) states that "If the projected price or harvest price cannot be calculated for the current crop year under the provisions contained in the Commodity Exchange Price Provisions [f]or the harvest price" that "[r]evenue protection will continue to be available; and [t]he harvest price will be determined and announced by FCIC."  (3(c)(5)(ii)(A-B) of 11-BR.)

Watt's phrasing noting that, "[t]here have been occasions in the past when AMS prices have not been available." (*Id.* at 1182.)  The RMA was concerned that given the program's structure, should prices be again unavailable, "the projected price will be substituted for the harvest price which essentially converts the revenue offer to yield protection with the insured paying the premium for revenue coverage but only getting yield coverage." (*Id.*)

In February 2012 Watts replied to this comment, asserting that: "[t]he comment mixes apples and oranges.  First, it raises an issue of lack of AMS prices (the harvest price determination).  Then it describes the action to be taken when the projected price cannot be determined." (*Id.* at 1175, 1182.)  The reply goes on to say that "[t]he language in the submission regarding inability to determine the harvest price when the projected price has been determined is substantially the same as that of section 3(c)(5) of 11-BR." (*Id.* at 1182.)

In a separate January 2012 document with questions and comments for Watts, the RMA asked whether the intent of the language in the Proposal was to transfer the responsibility for the development of the prices from the Watts to RMA if there were issues with Watts's estimates.  (FCIC825-26, Docket No. 116, #33.)  The RMA noted that "[t]his could be a significant 'ownership' issue if this product were implemented." (*Id.*)

**C.  Expert Reviews**

During this time, experts were reviewing the Watts submission, and submitted comments and reports in January 2012.  Among other questions and concerns, one expert

group—Acacia Economic Consulting, LLC ("Acacia")—raised concerns about the Watts harvest-price methodology because "[h]istorically, there have been occasions when AMS failed to report harvest price data during these months for some types of dry beans. Typically this is due to thin market volume."  (FCIC1239, Docket No. 116 #38.)  The expert report specifically noted as examples that "2008 AMS failed to report Minnesota/Wisconsin dark red kidney bean prices in September, October, or November" and that "[i]n 2009, AMS failed to report Minnesota/Wisconsin dark red kidney bean prices in September and October."  (*Id.*)  Because, if there is no price reported, the policy "substitute[s] the projected price for the missing month when calculating harvest price," the potential lack of data is an issue.  (*Id.* at 1240.)

Acacia noted that, "[i]n the extreme case where AMS fails to report a price for September, October, and November the harvest price would be equal to the projected price and the revenue insurance product (with or without the harvest price exclusion) would revert to a yield insurance product," even though they had paid for the additional revenue protection.  (*Id.*)  Acacia felt that while it was reasonable "have a contingency plan for situations when AMS fails to report a price," it was "unfair to growers who pay for revenue insurance for that contingency plan to effectively shift the policy away from revenue coverage and toward yield coverage."  (*Id.*)

Another expert report, from a professor at North Carolina State University, which raised a variety of concerns about the actuarial soundness of the policy, noted that it was

possible that "there could easily come a time when it becomes cost-prohibitive for the industry to cooperate [in price data sharing] purely from the standpoint of the resources that would be consumed in updating the data needed each year for deriving the projected price." (FCIC1319, Docket No. 116 #40.)  On the whole, this expert was more concerned about the projected price data, and potential methodological disparities between the two prices.

The remainder of the experts supported the pricing methodology.  Deloitte Consulting, LLP noted that when there is "thin trading volume, prices are not given" in the Bean Market News, but that the "AMS is administered by the USDA, and thus we believe that the bean market data will continue to be available." (FCIC1290, Docket 116, #39.)

Rimrock Reviewing wrote that "the data is probably adequate, credible, and reliable for establishing the projected and harvest prices," but that in its view, the historical data seemed to indicate lower-than-expected prices, perhaps indicating issues with the quality of the product. (*Id.* at FCIC1361-62.)  However, the report found no issue with the availability of data, stating that, "[t]he number of contracts the data would typically be derived from might be considered somewhat thin, but probably is adequate. Considering the letters of support contained in the submission, I believe the data will be continuously available in the future." (*Id.* at FCIC1362.)  Furthermore, Rimrock wrote that "I believe the data proposed to be used for determining the projected price and harvest price (if adjusted for quality) are appropriate, reliable and the best available for such

purposes." (*Id.* at FCIC1364.)  Overall, the report found that, "these are probably minor concerns compared to the benefit that would be derived by producers from the availability [of the Endorsement]" and that "[o]verall, I believe this is a viable submission." (*Id.* at FCIC1360.)

Watts presented a powerpoint in response to the expert opinions asserting that "[d]ata can be collected and maintained to operate the product" and that "[t]he processes for establishing projected price and harvest price are reasonably reliable." (FCIC1402, Docket No. 116, #43.)  Watts attached a variety of letters that it characterized as confirming that Watts had sufficient data for determining the projected price. (*Id.* at FCIC1373.)

### D.  Board Approval and Final Changes

The FCIC Board approved the Watts Proposal in March 2012.  (FCIC822, Docket No. 116, # 32; FCIC1499 Docket No 116, #49. )  Specifically, the Board resolved to approve the submission, "beginning with the first crop year that the Manager determines is practicable with reinsurance and administrative and operating subsidy in amounts and under such terms and conditions as determined appropriate by the Manager as authorized under section 508(h) of the Federal Crop Insurance Act." (*Id.* at FCIC822, FCIC1499.)  The Board also delegated to the Manager "the authority to make such technical policy changes as are necessary to make the policy legally sufficient." (*Id.* 822, 1499.)

A few weeks later, Watts and the RMA continued to discuss the policy language. Ron Lundine at the RMA sent a marked-up copy of the policy language, which still reads "[i]f the harvest price as defined cannot be calculated for the crop year for a type for which a projected price was determined in accordance with the definition: (i) A harvest price will be determined and announced by FCIC."  (FCIC1559, Docket No. 116, #52.) There are two comments in the paragraph from "RL," but the document does not preserve what his comments are.  (*Id.*)  In late March, Watts provided a response to many of these questions, addressing errors and making other language changes to the policy. (FCIC1570, Docket No. 116, #53.)   However, as to this question, Watts provided a seemingly incomplete response:  "With regard to the question about how RMA is to determine a harvest price, the language contained in these crop provisions is identical to the language contained in the Basic Provisions.  With regard to the statements in the submission regarding missing AMS data, [Alex??]."  (*Id.* at 1572-72.) (brackets in the original.)

In mid-April 2012, Watts and the RMA had a call to continue discussing product roll-out and structure.  (FCIC1586, Docket No. 116, #54.)  On the call, Watts and the RMA agreed to structure the policy as an endorsement, and discussed the mechanism for that structure.  (*Id.*)  They also discussed pricing issues, including that "[w]e need to consider eliminating language that puts pricing at RMA discretion, [w]e need to devise a prescriptive pricing method and discovery window[, and we] need to figure out the policy

stuff and then get this straightened out." (*Id.*) RMA and Watts were still working on edits

and changes to the various policies and provisions in November and December 2012.

(FCIC1592-96, Docket No. 116, #57.) By December 2012, the parties had mostly finalized

the provisions, including this paragraph, resulting in policy language essentially identical

to the Endorsement later purchased by Plaintiffs in this case. (*Id.* at FCIC1598-99.)[5]

## IV.    THE ENDORSEMENT

Each of the Plaintiffs purchased the Endorsement, and while the levels of coverage

vary, the contractual language is identical. As relevant to this action, the Endorsement

contains the following provisions:

> **2.  Definitions**
> …
> Harvest price – In lieu of the definition contained in the Basic
> Provisions, a price determined for each type in accordance with
> section 7 of this endorsement and used to value production to
> count.
> Market price – Either a value or the mid-point of a range of values
> identified as "Dry Bean Grower Information" or similar descriptor
> as published in the Bean Market News, a publication of the
> Agricultural Marketing Service, USDA, for a specific type of dry
> bean in a specific region.
> Offer price – A contractual offer made by a buyer to producers to
> grow and deliver a specified type of dry beans to the buyer at the
> specified price.
> Projected price – In lieu of the definition contained in the Basic
> Provisions, a price determined for each type in accordance with
> section 7 of this endorsement.

---

[5] The version of the Dry Beans Revenue Insurance Standards Handbook in this submission is also
materially identical to the final version of the Handbook, discussed below. (*Id.* at FCIC1615.)

**3. Insurance Guarantees, Coverage Levels, and Prices.**

. . .

    (c) In lieu of section 3(c)(5) of the Basic Provisions:

        . . .

        (2)    If the harvest price cannot be calculated for the crop year for a type for which a projected price was determined in accordance with section 7 of this endorsement, the harvest price will be equal to the projected price.

**4. Causes of Loss.**

In addition to the causes of loss specified in section 10 of the Dry Bean Crop Provisions, insurance is provided against a change in the harvest price from the projected price[.]

. . .

**7. Price Discovery.**

    (a) In accordance with section 2, this section specifies how and when the projected price and harvest price will be determined.

    . . .

    (d) Section 7(e)(3) applies in the case that either a projected price or a harvest price cannot be determined in the manner described in the following provisions.

    (e) The projected and harvest prices for a type within a region will be established as follows:

    . . .

        (2)    The harvest price for … dark red kidney beans… will be determined by the following procedure:

            (A) The market price of each type for each day of publication during the period beginning on the first business day in September and ending on the last business day of November will be collected;

            (B) A market price will not be recorded for a date if market activity on that date is described with the terms

including "limited" (Ltd), "very limited" (V Ltd), or "Not Established" or similar terms that indicate a small volume of sales or no sales occurred on that date;

(C) A harvest price will not be established if there is a market price for fewer than 50 percent of the dates of publication included in the period defined in 2(A) …

. . .

(2) If a projected price for any of these types cannot be determined as described herein:

(A) The projected price will be determined by RMA and announced not later than the third business day in March; and

(B) The harvest price will equal the projected price.

(f) Because there is not a sufficient volume of contracting for types other than black beans, dark red kidney beans, navy beans, pinto beans, and small red beans… the procedure described for those types cannot be utilized for other types.  However, revenue protection is still considered to be available and the projected and harvest process will be determined by RMA.  This action allows you to insure all types of dry beans under revenue protection.  However, the types subject to this section will not have the benefit of a change in the harvest price relative to the projected price.  You must elect 100 percent of the projected price.

(1) In lieu of the definition of projected price contained in the Basic Provisions, the projected price shall be determined by RMA and shall be the higher of the projected price announced not later than the contract change date or the additional projected price announced not later than 15 days prior to the sales closing date; and;

(2) The harvest price shall be equal to the projected price for the applicable type.

...

(TAC, Ex. A, "the Endorsement.")

## V.   THE HANDBOOK

Accompanying the Endorsement is the Dry Beans Revenue Insurance Standards Handbook (the "Handbook"), which "provides the official FCIC-approved 2013 and succeeding crop years underwriting and administration standards" for the Endorsement, and notes that "[a]ll approved insurance providers electing to offer the Dry Bean Revenue Endorsement must utilize these standards."  (FCIC1532, Docket No. 116, # 50.)  The Handbook was issued by the USDA, the FCIC, and the RMA.  (*Id.*)

The Handbook explains that it "provides instructions for establishing coverage in accordance" with the Endorsement" and that it "provides the FCIC-approved procedures for administering the Dry Bean Revenue Endorsement."  (*Id.* at FCIC1543.)  The Handbook repeats the pricing scheme established in the Watts Proposal wherein "[t]he harvest price for black beans, dark red kidney beans, navy beans, and pinto beans will be a value approved by RMA determined from analysis of prices received by growers for each week of publication beginning September 1 and ending on the last business day nearest November 30 of the crop year as reported by the Bean Market News, a publication of the Agricultural Marketing Service, USDA."   (*Id.* at FCIC1547.)

The Handbook goes to explain the procedure for cases where a projected price is established, but a harvest price cannot be determined.

-16-

> The language of section 3(c)(5) of the Basic Provisions has been modified for the Dry Bean Revenue Endorsement.  If a harvest price cannot be determined for black beans, dark red kidney beans, navy beans, and pinto beans as described by its definition but a projected price was established according to its definition, RMA will establish the harvest price.

*Id.* at FCIC1538.

## VI.    THE 2015 CROP YEAR

In 2015, Watts obtained projected prices for dark-red kidney beans in Minnesota. However, in December 2015 it became clear that there were issues with the harvest price. "For the 12 eligible weeks (with the exclusion of Thanksgiving), there were eleven black bean observations, two dark red kidney bean observations, eleven navy bean observations, and twelve pinto bean observations for the Minnesota and North Dakota areas."  (Docket No. 117, FCIC2350 #27.)  As a result, there was not sufficient data with which "to establish a harvest price for dark red kidney bean type."  (*Id.*)  In Michigan, the price collection issues were even more dire—Watts could not establish a harvest price for any of the dry-bean types available there.  (*Id.*)

Watts explained that it learned from AMS that the Bean Market News "labels price observations limited when there are two observations collected and very limited when only one is collected.  If three or more observations are collected no label is attached."  (*Id*. at FCIC2351.)  Watts notes that it had twice reached out to industry to "encourage participation in the AMS surveys among market participants, but with little apparent

result" and suggested that the issue might be market illiquidity given a large crop and a weak export demand.  (*Id*. at FCIC0002353.)

The RMA expressed concerns about "the reoccurring data insufficiency for some of the dry bean types."  (FCIC4206 Docket No. 117, #85.)  RMA reviewed Watts' report and requested dry-bean data, which Watts sent.  (*Id.* at FCIC4233, 4564.)  Among other things, the RMA corrected Watts' assertion that there was a liquidity issue when there was, in fact, a pricing issue.  (*Id.* at FCIC4565.)

In an updated report, Watts explained that the reason for the lack of pricing was that "strong production both domestically and internationally, paired with a strong dollar (which makes American exports expensive relative to other country's production), weakening economies in the developing world, and generally tepid exports have all collectively pushed prices lower this harvest season."  (FCIC4548, Docket No. 118, #22.) As a result, pricing has been difficult and "most warehouses chose not to post any price at all.  (*Id.*)  Watts noted that "the lack of reports will be painful for growers; without the ability to publish a harvest price, many growers will endure a revenue loss, but will not receive a revenue-based indemnity."  (*Id.*)  Only two dark-red kidney bean prices were available and were both for $0.33 to $0.35 per pound, as opposed to the projected price, which had been set at $0.53 per pound.  (*Id*. at FCIC4550.)

On December 15, 2015, the RMA posted the harvest prices set by Watts on its website, along with the note indicating that per the Endorsement, "the harvest price will

be equal to the projected price when a harvest price cannot be determined." (FCIC2326, Docket No. 117, #25.) The price for dark-red kidney beans in Minnesota and North Dakota was set at the projected price. (*Id.*)

In response to calls from members of Congress regarding their constituent farmers who were unhappy with the lack of revenue coverage, the RMA said in an email that "[t]t is very unlikely anything can be done for the 2015 crop year. The endorsement specifies the data requirements necessary to establish a harvest price and unfortunately for 2015, they were not met." (FCIC10795, Docket No. 120, #20.) The RMA went on to note that "[t]he endorsement also specifies that if data are not sufficient to establish a harvest price, the harvest price will equal the projected price. The endorsement doesn't provide any language to refund the portion of additional premium for revenue coverage." (*Id.*)

On December 31, 2015, Watts submitted a modification proposing changes to the harvest-price requirements. Specifically, the requirements for determining prices were somewhat relaxed, allowing consideration of "Limited" reporting (though still disallowing "Very Limited" reporting), and giving more time for the RMS to publish the harvest price. (FCIC13105–06, Docket No. 121, #2.) Watts also included commitments from processors committing to providing harvest pricing data going forward. (FCIC14351–74, Docket No. 121, #4.) The Board adopted these changes. (FCIC14494, Docket No. 121, #14.)

## VII.    MICHIGAN LITIGATION AND PROCEDURAL HISTORY

This case was brought initially as a putative class action in the Eastern District of Michigan, and included several, but not all, of the Plaintiffs in this case. (Compl., June 5, 2017, Docket No. 1.) The court in Michigan dismissed the Michigan plaintiffs' claims against a variety of insurers because they were bound by an arbitration agreement. (Order Granting Mot. to Dismiss at 28, April 18, 2018, Docket No. 70.) That court also dismissed the Minnesota Plaintiffs for improper venue, because under 7 U.S.C. § 1506(d), they were required to bring suit in either the District of Columbia or the district where they resided or farmed. (*Id.*) After a motion for reconsideration, the Minnesota residents in the Michigan case were transferred to this District. (Order Granting Mot. for Reconsideration, June 1, 2018, Docket No. 80; Transfer to D. Minn., June 8, 2018, Docket No. 81.) In February 2019, plaintiffs filed their Third Amended Complaint ("TAC") which is the operative pleading. (TAC, Feb. 26, 2019, Docket No. 89.)

Litigation continued in the Eastern District of Michigan. Counsel for Plaintiffs continued to represent the Michigan plaintiffs. The claims of the parties are tightly related—the core of both complaints is that Defendants acted arbitrarily and capriciously regarding the Endorsement and the 2015 harvest-price determination. (*Compare* TAC *with* SAC, April 30, 2018, Docket No. 72.)

In July 2019, Judge Thomas Ludington of the Eastern District of Michigan granted summary judgment in favor of Defendants and denied the Michigan Plaintiffs' competing motion for summary judgment. *Ackerman Bros. Farms, LLC v. U.S. Dep't of Agric.*, No. 17-

CV-11779, 2019 WL 3067927, at *13 (E.D. Mich. July 12, 2019), *reconsideration denied*

*sub nom. Ackerman v. U.S. Dep't of Agric.*, No. 17-CV-11779, 2019 WL 6837785 (E.D. Mich.

Dec. 16, 2019).  That court found that Defendants' interpretation of the Endorsement was

not arbitrary and capricious, because: (1) the language of the Federal Crop insurance Act

does not require Defendants to set the harvest price at the market price, instead of the

projected price; (2) Watts, not the RMA, set harvest prices, and Defendants had no

discretion; (3) the Endorsement's language regarding harvest-price contingency

procedures, rather than the Handbook's, controls; and (4) Defendants' reliance on expert

reports was rational and the approval of the Endorsement was not arbitrary and

capricious.  *Id*. at *12–25.

The court also declined to consider any Managers Bulletins which purported to

show that the RMA had authority to disregard the language of the Endorsement, because

the Bulletins were not in the administrative record and because the Michigan plaintiffs

had not moved to supplement the record.  *Id.* at *8.  Plaintiffs filed a motion for

reconsideration, which was denied, and the case is now on appeal to the Sixth Circuit.

The Minnesota Plaintiffs brought a Motion for Summary Judgment in September

2019, arguing that as a matter of law, Defendants acted arbitrarily and capriciously in not

setting a harvest price when Watts failed to determine the harvest price for dark-red

kidney beans.  (Mot. for Summ. J., Sept. 6, 2019, Docket No. 131.)  Specifically, Plaintiffs

argue that (1) Defendants should have understood the Endorsement and the Handbook

to require the RMA to set a harvest price; (2) that the RMA should have used its equitable powers to prevent the Endorsement's revenue coverage from converting to yield coverage; and (3) that Defendants' approval of the Endorsement was itself arbitrary and capricious.

Defendants bring a Cross Motion to Dismiss and, in the alternative, for Summary Judgment. (Mot. to Dismiss or for Summ. J., Oct. 25, 2019, Docket No. 141.) Defendants argue first that Plaintiffs' claims are precluded by the *Ackerman* decision. Defendants further argue that any errors in the Endorsement were the fault of Watts, and that it did not act arbitrarily or capriciously in authorizing or administering the Endorsement. (*Id.*) The parties submitted supplemental briefing on May 22, 2020, which the Court will consider to the extent appropriate. (Pls.' Supp. Brief, Docket No. 168, Defs.' Supp. Brief, Docket No. 169.)

## DISCUSSION

## I.    MOTION TO DISMISS/JUDGMENT ON THE PLEADINGS

Defendants purport to bring a Motion to Dismiss under Rule 12(b)(6), although they answered the TAC months prior to this filing. (Answer to TAC, Mar. 12, 2019, Docket No. 90.) "Technically . . . a Rule 12(b)(6) motion cannot be filed after an answer has been submitted."  *Westcott v. City of Omaha*, 901 F.2d 1486, 1488 (8th Cir. 1990). However, the Court will instead consider the Motion to be a Rule 12(c) Motion for Judgment on the Pleadings, given that the same standards govern and the distinction is purely formal. *Id.*

USDA argues that Plaintiffs' Motion for Summary Judgment is partially or entirely precluded as a result of the *Ackerman* decision.  "The preclusive effect of a judgment is defined by claim preclusion and issue preclusion, which are collectively referred to as 'res judicata.'"  *Taylor v. Sturgell*, 553 U.S. 880, 892 (2008).  Claim preclusion prohibits relitigation of the same claims, regardless of whether the claim raises the same factual or legal issues, whereas issue preclusion prohibits relitigation of an "issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment, even if the issue recurs in the context of a different claim."  *Id.*  (cleaned up).

Preclusion is an affirmative defense properly raised by a motion to dismiss or judgment on the pleadings, as long as the defense is "apparent on the face of the complaint[.]"  *C.H. Robinson Worldwide, Inc. v. Lobrano*, 695 F.3d 758, 763-64 (8th Cir. 2012) (quoting *Noble Sys. Corp. v. Alorica Cent., LLC*, 543 F.3d 978, 983 (8th Cir. 2008)).  In considering such a motion based on preclusion, the court accepts the plaintiff's factual allegations as true.  *See, e.g.*, *Laase v. Cty. of Isanti*, 638 F.3d 853, 856 (8th Cir. 2011).

### A.  Claim Preclusion/Res Judicata

Claim preclusion exists when "(1) the first suit [resulted] in a final judgment on the merits; (2) the first suit [was] based on proper jurisdiction; (3) both suits [involved] the same nucleus of operative fact; and (4) both suits [involved] the same parties or their privies."  *Kolb v. Scherer Bros. Fin. Servs. Co.*, 6 F.3d 542, 544 (8th Cir. 1993).  Only the fourth element is in dispute here.  With few exceptions, "[a] person who was not a party

to a suit generally has not had a 'full and fair opportunity to litigate' the claims and issues settled in that suit." *Taylor*, 553 U.S. at 892–93 (quoting *Richards v. Jefferson Cty*, 517 U.S. 793, 798 (1996)).  The application of claim and issue preclusion to nonparties thus runs up against the "deep-rooted historic tradition that everyone should have [their] own day in court." *Id.* (quoting *Richards*, 517 U.S. at 798).

One exception, however, is the adequate-representation exception, which applies "in certain limited circumstances" to bind a nonparty because they were "adequately represented by someone with the same interests who was a party to the suit. Representative suits with preclusive effect on nonparties include properly conducted class actions and suits brought by trustees, guardians, and other fiduciaries." *Id*. at 894 (cleaned up).  Beyond those specific examples, nonparty representation is adequate "only if, at a minimum: (1) The interests of the nonparty and her representative are aligned; and (2) either the party understood herself to be acting in a representative capacity or the original court took care to protect the interests of the nonparty." *Id*. at 900 (cleaned up).

Plaintiffs in this case were not parties to the *Ackerman* decision.  Although some of the Plaintiffs in this case were initially parties to the *Ackerman* case, they ceased to be once their claims were transferred to this District.  These claims were transferred because of the requirement in 7 U.S.C. § 1506(d) that "any suit against the Corporation (Federal

Crop Insurance Corporation) shall be brought in the District of Columbia, or in the district wherein the plaintiff resides or is engaged in business."

Defendants argue that the adequate-representation exception applies.  First, Defendants assert that Plaintiffs are privies with the *Ackerman* plaintiffs because their interests clearly align.  The interests of the two groups of plaintiffs are unquestionably linked.  However, Defendants have not made any showing that the *Ackerman* plaintiffs understood themselves to "be acting in a representative capacity" for the Plaintiffs, or that the District Court in Michigan "took care to protect the interests" of the Plaintiffs here.  *See Taylor*, 553 U.S. at 900.  To the contrary, Plaintiffs were involuntarily severed and their claims dismissed, and only later transferred to this District.

Additionally, Defendants argue that, because both *Ackerman* and the present case were filed as putative class actions, Plaintiffs' interests were adequately represented by the *Ackerman* plaintiffs.  First, the Supreme Court has clarified the adequate-representation exception does not apply based on a putative class action, but rather only when classes have been certified.  *Smith v. Bayer Corp*., 564 U.S. 299, 314–15 (2011) (concluding that "[n]either a proposed class action nor a rejected class action may bind nonparties").  No class has been certified in either jurisdiction.  Furthermore, two of the Plaintiffs, Ludowese and Stamer, were never plaintiffs in the *Ackerman* case.

Finally, policy considerations also suggest that claim preclusion should not apply in this case.  The Supreme Court has reiterated that the exceptions to the doctrine against

nonparty preclusion are limited because due process requires an opportunity to be heard. *See e.g.*, *Smith*, 564 U.S. at 313; *Taylor*, 553 U.S. at 898.  Moreover, the fact that the Federal Crop Insurance Act requires that plaintiffs sue in the district where they reside or carry out their business suggests that Congress decided local litigation is more important for these cases than conservation of judicial resources—the policy purpose driving preclusion.  *See, e.g.*, *Taylor*, 553 U.S. at 892 ("[Preclusion] doctrines protect against the expense and vexation attending multiple lawsuits, conserve judicial resources, and foster reliance on judicial action by minimizing the possibility of inconsistent decisions." (cleaned up)).  Severing and transferring Plaintiffs only to preclude their claims would run counter to the due-process concerns that motivate the limited and narrow exceptions to nonparty preclusion.

Accordingly, the Court finds that Plaintiffs' claims are not barred by claim preclusion.

### B.  Issue Preclusion/Collateral Estoppel

Issue preclusion exists when five elements are present: (1) the current party was a party (or was in privity with a party) to the original action; (2) the issue is the same as one involved in the prior action; (3) the issue was actually litigated in the prior action; (4) the issue was determined by a valid and final judgment; and (5) that determination must have been essential to the prior judgment.  *Robinette v. Jones*, 476 F.3d 585, 589 (8th Cir. 2007).

As with claim preclusion, issue preclusion is disfavored for nonparties to the prior litigation. *See Taylor*, 553 U.S. at 892–93.

Defendants argues that, to the extent the issues in this case were already litigated in *Ackerman*, those issues are precluded here. However, as discussed above, although some of the Plaintiffs in this case were initially parties to the *Ackerman* case, they had been severed and transferred to this District prior to the *Ackerman* order. The remainder of Plaintiffs were never parties to the *Ackerman* case. Defendants have not demonstrated that Plaintiffs were in privity with the *Ackerman* plaintiffs. Finding that the first element of issue preclusion is not met, the Court need not reach the remainder.

Accordingly, the Court finds that Plaintiffs' claims are not barred by issue preclusion.

## II.   JUDICIAL NOTICE

Plaintiffs ask the Court to take judicial notice of past issues of the Bean Market News and prior Managers' Bulletins from the RMA that are not in the Administrative Record. [6]

---

[6] Plaintiffs previously asked the Court to supplement the Administrative Record with these documents (a motion that the Magistrate Judge denied without prejudice, Minute Entry, Aug. 28, 2019, Docket No. 129), but now frames the request as one for judicial notice, not supplementation.

Typically, judicial notice of adjudicative facts—that is, those facts that are relevant to the case—is governed by Federal Rule of Evidence 201.  Specifically, the court can take judicial notice of "a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b)(2).  However, some courts have adopted a heightened standard for judicial notice in an APA case.  For example, the District Court for the District of Columbia has rejected judicial notice in the APA judicial review context on several occasions, explaining that: "[j]udicial notice is typically an inadequate mechanism for a court to consider extra-record evidence in reviewing an agency action.  Instead, a court may only consider an adjudicative fact subject to judicial notice that is *not* part of the administrative record if it qualifies for supplementation as extra-record evidence."  *Silver State Land, LLC v. Beaudreau*, 59 F. Supp. 3d 158, 172 (D.D.C. 2014) (internal quotations omitted).  The District of New Mexico rejected judicial notice for a different reason: the court's function as an appellate body for the purposes of APA judicial review.  *Jarita Mesa Livestock Grazing Ass'n v. U.S. Forest Serv.*, 305 F.R.D. 256, 297 (D.N.M. 2015) ("Given this case's posture as an appeal, the Court will not take judicial notice of adjudicative facts, except to the extent that the underlying factual developments arose after the last agency action.")  The Eighth Circuit has not spoken on this issue.

However, the Court need not reach the appropriate standard here, because these documents are not relevant to the Court's analysis of the merits.  *See, e.g.*, *Dist. Hosp.*

*Partners, L.P. v. Sebelius*, 971 F. Supp. 2d 15, 32 (D.D.C. 2013).  Even if the documents illustrate the facts as Plaintiffs have alleged (that the Managers' Bulletins demonstrate the RMA has equitable powers, and that the Bean Market News back issues demonstrate that it did not always contain sufficient pricing information) such facts would not alter the Court's view of the issues, as discussed in more detail below.

Accordingly, the Court will decline to take judicial notice of these additional documents.

## III.   SUMMARY JUDGMENT

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party can demonstrate that it is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  A fact is material if it might affect the outcome of the suit, and a dispute is genuine if the evidence is such that it could lead a reasonable jury to return a verdict for either party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A court considering a motion for summary judgment must view the facts in the light most favorable to the non-moving party and give that party the benefit of all reasonable inferences to be drawn from those facts.  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  The nonmoving party may not rest on mere allegations or denials but must show through the presentation of admissible evidence that specific facts exist creating a genuine issue for trial.  *Anderson*, 477 U.S. at 256.

### A. Administrative Procedure Act

Under the Administrative Procedure Act, the Court "shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action." 5 U.S.C. § 706. The Court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]" *Id.* § 706(2)(A). Courts may not "rubber-stamp" administrative decisions but must also accord an agency "great deference" in its interpretation of its own regulations. *Moore v. Custis*, 736 F.2d 1260, 1262 (8th Cir. 1984) (internal quotation omitted).

"The court is not empowered to substitute its judgment for that of the agency" and the agency must only "articulate a rational connection between the facts found and the choice made." *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 285–86 (1974) (internal quotation omitted). The Court will "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Id.*

To find an agency action arbitrary and capricious, courts must find that "there is no rational basis for the action." *Moore*, 736 F.2d at 1262. Plaintiffs must demonstrate that the agency action was a "willful and unreasoning action, without consideration and in disregard of the facts or circumstances of the case[.]" *Id.* (quoting *First Nat'l Bank of Fayetteville v. Smith*, 508 F.2d 1371, 1376 (8th Cir. 1974)). Furthermore, courts will "defer

to the agency's choice of methodology as long as it is not arbitrary or without foundation."

*Friends of Boundary Waters Wilderness v. Dombeck*, 164 F.3d 1115, 1130 (8th Cir. 1999)

Plaintiffs advance two general theories: (1) that Defendants acted arbitrarily and capriciously in approving the Endorsement, given the potential issue with harvest pricing; and that (2) that Defendants acted arbitrarily and capriciously by not setting the harvest prices at the market prices in 2015.

### B.  2015 Harvest Pricing

Plaintiffs argue that Defendants acted arbitrarily and capriciously in not setting a harvest price in 2015 after Watts was unable to determine the harvest price.  Specifically, Plaintiffs argue that (1) Defendants should have understood the Endorsement and the Handbook to require the RMA to set a harvest price; and (2) that the RMA should have used its equitable powers to prevent the Endorsement's revenue coverage from converting to yield coverage.

#### 1.  Endorsement and Handbook

Plaintiffs argue that when Watts failed to determine the harvest price for dark-red kidney beans, Defendants acted arbitrarily and capriciously in not setting a harvest price. Specifically, Plaintiffs argue that Defendants should have understood the Endorsement and the Handbook to require the RMA to set a harvest price when the Bean Market News mechanism failed in 2015.

Plaintiffs are correct that when courts interpret insurance policies, "reasonable doubt as to its meaning must be resolved in favor of the insured[.]"  *Bobich v. Oja*, 104 N.W.2d 19, 24 (Minn. 1960); *see also Staffing Specifix, Inc. v. TempWorks Mgmt. Servs., Inc.*, 913 N.W.2d 687, 693 (Minn. 2018) (The rule that ambiguous contract terms are to be construed against the drafter has been called the canon of '*contra proferentem*.'  The rule is commonly (but not exclusively) applied in the insurance context.").  However, "the court has no right to read an ambiguity into plain language of an insurance policy[.]"  *Bobich*, 104 N.W.2d at 24*.  "*Where there is no ambiguity there is no room for construction" and the court must give the language "its usual and accepted meaning."  *Id.*

The Endorsement, on its face, clearly states at section IV(3)(c)(2) that "[i]f the harvest price cannot be calculated for the crop year for a type for which a projected price was determined in accordance with section 7 of this endorsement, the harvest price will be equal to the projected price."  The clear language of the Endorsement requires Defendants to set the harvest price at the proposed price if the harvest price cannot be determined.  Because the contract is clear, the Court's analysis must stop there.

It is unquestionably true that the Handbook directly conflicts with the Endorsement on this point and sets the responsibility to set a harvest price in these circumstances with Defendants.  In at least one email from Watts, Watts (wrongly) reassures Defendants that the Endorsement language is similar to the Basic Provisions language which, like the Handbook, would put the harvest price in the hands of

Defendants.  It appears that throughout the development of the policy, Watts and the Defendants went back and forth as to how this issue would be handled.

However, by the time the Endorsement was finalized, it included the language setting the harvest price at the proposed price.  And because the Endorsement itself is clear, the Handbook has no part in the interpretation.  Plaintiffs urge the Court to find that the Endorsement and the Handbook are essentially one contract and that as a result their contradictory terms should be read in favor of the insured.  However, the Handbook is not an addendum or an amendment to the Endorsement, but instead is a separate document intended to provide guidance for the Endorsement.  It does not modify or control the Endorsement; on the contrary, the Endorsement is the governing document. *See* Common Crop Insurance Policy, 7 C.F.R. § 457.8 ("We will use the procedures [including] handbooks . . . in the administration of this policy, including the adjustment of any loss or claim submitted hereunder."   While Defendants must use the Handbook in the administration of the Endorsement, the Endorsement must control.

Plaintiffs cite to *Conrad v. Ace Property & Casualty Insurance Co.*, a Ninth Circuit case holding that a similar crop-revenue insurance policy must be interpreted in accordance with the procedures and methods set out in the accompanying handbook. *Conrad v. Ace Prop. & Cas. Ins. Co.*, 532 F.3d 1000, 1007 (9th Cir. 2008).  However, as the court in *Ackerman* found, the facts and policy language here are distinguishable from *Conrad*.  *Ackerman*, 2019 WL 3067927, at *9.  In *Conrad*, the policy language did not

contain a certain calculation method; instead, it required that the parties "recognize and apply the claim adjustment and other procedures established or approved by FCIC[.]" 532 F.3d at 1006. *Conrad* then found that the handbook, which specifically explained that it contained "**THE OFFICIAL FCIC–APPROVED UNDER–WRITING, ADMINISTRATION, AND LOSS ADJUSTMENT STANDARDS**," was incorporated into the policy insofar as it set out the approved and established procedures. *Id.* at 1007.

Here, on the other hand, the Endorsement, on its own, is complete as to the methodology for calculating the harvest price in the absence of sufficient data. *Conrad* does not stand for the proposition that the Handbook is necessarily and equally a part of the Endorsement. Instead, *Conrad* explains that when a contract references a specific outside policy, that policy itself is incorporated into the contract. Accordingly, *Conrad* has no bearing on the analysis here.

Defendants followed the language of the Endorsement and set the harvest price at the proposed price. Because the Endorsement was complete on its face, and because the Endorsement, as the actual policy, supersedes the Handbook as the implementation document, Defendants' actions were not arbitrary and capricious.

## 2. RMA's Equitable Powers

Plaintiffs next argue that the RMA has jurisdiction over Pilot Programs, such as the Endorsement and has, in other cases, intervened equitably when such programs went awry. As a result, Plaintiffs argue that RMA's failure to use equitable powers here—to

reform the Endorsement and set a reasonable harvest price—was arbitrary and capricious.

Even assuming that the RMA has the jurisdiction and equitable powers that Plaintiffs claim and could have reformed the Endorsement, Plaintiffs have not shown any reason why the failure to do so should be considered arbitrary and capricious. Plaintiffs cite no law indicating that an agency must use equitable powers under particular circumstances. On the contrary, the very nature of equitable power implies that there is significant room for judgment and discretion.

As discussed above, Defendants reasonably understood the language of the Endorsement to set the harvest price at the projected price. While declining to reform the contract may not have been the best or wisest decision, it does not appear to be an arbitrary and capricious one.

### 3. Conclusion

While the Endorsement's policy was flawed, and the 2015 crop year resulted in losses for farmers, Plaintiffs have not demonstrated that Defendants' action was a "willful and unreasoning action, without consideration and in disregard of the facts or circumstances of the case." *Moore*, 736 F.2d at 1262 (quoting *Smith*, 508 F.2d at 1376). Because Defendants reasonably interpreted the language of the Endorsement, and because Plaintiffs have not demonstrated that it was arbitrary and capricious to decline to use any equitable powers to reform the contract, the Court will grant Defendants'

Motion for Summary Judgment and deny Plaintiffs' Motion for Summary Judgment as to Count 1 of the TAC.

### C.  Approval of the Endorsement

Plaintiffs argue that Defendants' initial approval of the Endorsement was arbitrary and capricious because the harvest-price contingency procedure is flawed and (1) the administrative record does not contain evidence that Defendants reviewed historical records of the Bean Market News; (2) the administrative record does not contain evidence that Defendants reviewed the Bean Market News' reporting methodology; and (3) Defendants did not give sufficient consideration to expert reviews.   Essentially, Plaintiffs argue that because the Endorsement was flawed, Defendants must have failed to consider all relevant factors.

#### 1.  Expert Concerns

Plaintiffs argue that Defendants failed to sufficiently consider expert reviews when it approved the Endorsement.

Plaintiffs argue that Defendants did not review the full body of expert reports. First, federal law requires Defendants to "include reviews conducted . . . as part of the consideration of any policy or plan or insurance . . . proposed to be offered."  7 U.S.C. § 1505(e)(4)   The Administrative Record contains approximately 200 pages of expert reviews.   The Administrative Record was certified as containing the documents considered by the decision-maker.  "When there is a contemporaneous administrative

record and no need for additional explanation of the agency decision, there must be a strong showing of bad faith or improper behavior before the reviewing court may permit discovery and evidentiary supplementation of the administrative record."   *Voyageurs Nat'l Park Ass'n v. Norton*, 381 F.3d 759, 766 (8th Cir. 2004) (internal quotations omitted).

Plaintiffs argue that Defendants considered only a short summary of the expert reports.  However, Plaintiffs have provided no evidence for this assertion, much less "a strong showing of bad faith or improper behavior."   Without more, Plaintiffs cannot demonstrate that Defendants did not review the expert reports in the Administrative Record.

Plaintiffs next argue, essentially, that Defendants failed to give sufficient weight to those expert reviews which warned of potential issues with the Endorsement.  Plaintiffs are correct in noting that at least one expert pointed out the precise issue which caused the 2015 mess.  That report noted that the Bean Market News failed entirely to report Minnesota dark-red kidney bean prices in September, October, and November of 2008, and again in September and October of 2009.  The report reasoned that in the "extreme case" where there were no reported prices for September, October, and November, the harvest price would equal the projected price, and the product would revert to yield insurance, even though the farmers had paid for the additional revenue protection.  The report continued, noting that while it was reasonable to have some kind of contingency

plan if there were insufficient reported prices, this solution was unfair to farmers who paid for revenue insurance and would instead only receive yield coverage.

However, although this expert was prescient in predicting precisely the issue that arose in 2015, the majority of the other expert opinions recommended approval of the Endorsement.  Furthermore, Defendants could reasonably understand "an extreme case" to mean a rare, as opposed to a particularly damaging, case.  As such, it appears that Defendants had a rational basis to rely on the majority of the expert reports and discount the contrary expert's possibility of an "extreme case."

Accordingly, Defendants' consideration of expert reporting was not arbitrary and capricious.

### 2.  Bean Market News Historical Data

Plaintiffs argue that the Administrative Record does not contain evidence that Defendants reviewed historical issues of the Bean Market News.  Plaintiffs argue that because the Bean Market News was essential to the Proposal's pricing scheme, Defendants' failure to investigate the Bean Market News historical record violates the APA.

It is not clear that Defendants were required to investigate back issues of the Bean Market News or that a failure to do so would be arbitrary and capricious.  First, the administrative record indicates that Defendants reviewed summaries of the Bean Market News historical data prepared by Watts.  Second, as discussed, at least one expert raised

precisely the concern that Plaintiffs argue that a Bean Market News review would have uncovered—that in previous years, the Bean Market News had limited data, and that basing the pricing mechanism on the Bean Market News could be risky.  Finally, and most importantly, Watts discussed this very issue in the initial proposal, which noted that sometimes there were issues with pricing, and that, in 2008 black-bean prices were not reported for October or November, and that dark-red kidney bean prices were not reported at all from September through November.

Defendants had the information that Plaintiffs argue they failed to seek.  As a result, even if Defendants failed to independently investigate the Bean Market News, such a failure would not be arbitrary and capricious, because Defendants obtained this information by other means.

### 3.  Bean Market News Methodology

Finally, Plaintiffs assert that the Administrative Record does not contain evidence that Defendants investigated the method by which the Bean Market News collected and published price data.  Plaintiffs suggest that Defendants did not understand that limited pricing data might lead to no price being published in the Bean Market News.

However, the Endorsement explains that there is the possibility that prices could be considered "limited," "very limited," or "not established" and that these prices would not be considered.  Additionally, as discussed above, Defendants were aware from Watts, as well as from at least one expert report, that the Bean Market News did not always

contain sufficiently voluminous pricing to establish a harvest price.  Again, Defendants had the information that Plaintiffs assert they were required to seek.  It was not arbitrary and capricious not to reinvestigate information that Defendants already had.

4. Conclusion[7]

Although the Endorsement and Bean Market News reporting system was flawed, and the 2015 crop year resulted in losses for farmers, Plaintiffs have not demonstrated that Defendants' action in approving the Endorsement was arbitrary and capricious, given that the Court must "defer to the agency's choice of methodology as long as it is not arbitrary or without foundation." *Friends of Boundary Waters*, 164 F.3d at 1130.  Because Defendants were aware of the risks of Watt's pricing methodology, reasonably relied on

---

[7] Plaintiffs also argued in supplemental briefing submitted several months after oral argument that Defendants failed to approve the Endorsement, because Watts continued to make changes to the policy language (in coordination with the RMA) for months after the Board approved the initial proposal, but did not formally resubmit the finalized Endorsement language for reapproval. *See* 7 C.F.R. § 400.709(a)(2)(i) ("Any changes to approved 508(h) submissions, both non-significant and significant, must be submitted to FCIC in the form of a 508(h) submission for review[.]")  Plaintiffs argue that because the Administrative Record contains no such resubmission, Defendants' actions were arbitrary and capricious.

First, the changes here were non-significant changes, because they "involve[d] concepts that [had] been previously sent for expert review." *Id.* § 400.701 (defining non-significant change). As such, the Endorsement would not require an entirely new submission. *Cf. id.* § 400.709(a)(2)(ii) (noting that only significant changes "will be considered a new 508(h) submission").  Furthermore, the Board's approval of Watts's proposal clearly delegates the authority to make such technical policy changes as are necessary to make the policy legally sufficient.  Plaintiffs have not demonstrated that this delegation was improper, nor that the RMA staff who worked with Watts in finalizing the language were not contained within the delegation.

the majority of experts, reasonably could have discounted the expert to the contrary, and had sufficient information with which to make its decisions, the Court will Grant Defendants' Motion for Summary Judgment as to Count 2 of the TAC.

## FINAL NOTE

Minnesota dark red kidney bean farmers purchased revenue insurance for the 2015 crop year which was supposed to be designed to protect them against a drop in bean prices.  But a deeply flawed  process overseen by USDA resulted in the farmers instead receiving yield insurance in a year when revenue insurance, not yield insurance, was necessary to compensate for the significant drop in the harvest price of beans.  Why this significant flaw — the potential lack of published pricing data sufficient to establish a harvest price which resulted in a reversion to the projected price — was not noted by most of the "experts" who reviewed the plan is inexplicable.  And often, an increase in yield can cause a drop in prices, making yield insurance a poor substitute for revenue insurance.   The farmer pays for both, which gives insurance protection regardless of the summer conditions.  Usually, insurance consumers get what they pay for, but not this time.  But, as noted, the Court's ability to review agency actions in this case is significantly limited, thus the Court cannot provide a remedy for poor administration of a program needed by Minnesota farmers.   That is truly unfortunate.

**ORDER**

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS**

**HEREBY ORDERED** that:

1. Plaintiffs' Motion for Summary Judgment [Docket No. 131] is **DENIED**;

2. Defendants' Motion to Dismiss and Motion for Summary Judgment

   [Docket No. 141] is **DENIED** as to the Motion to Dismiss, and **GRANTED**

   as to the Motion for Summary Judgment.


**LET JUDGMENT BE ENTERED ACCORDINGLY.**



DATED:  August 21, 2020                 _____
at Minneapolis, Minnesota.                      JOHN R. TUNHEIM
                                                  Chief Judge
                                         United States District Court