# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| RICH ELBERT, JEFF A. KOSEK, REICHMANN LAND & CATTLE LLP, LUDOWESE A.E. INC., and MICHAEL STAMER, *individually and on behalf of a class of similarly situated persons*,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF AGRICULTURE, RISK MANAGEMENT AGENCY, and FEDERAL CROP INSURANCE CORPORATION,<br><br>Defendants. | Civil No. 18-1574 (JRT/TNL)<br><br><br><br><br><br>**MEMORANDUM OPINION AND ORDER** |

John D. Tallman, **JOHN D. TALLMAN PLLC**, 4020 East Beltline Avenue Northeast, Suite 101, Grand Rapids, MI 49525, for plaintiffs.

David W. Fuller, **UNITED STATES ATTORNEY'S OFFICE,** 300 South Fourth Street, Suite 600, Minneapolis, MN 55415, for defendants.

Plaintiffs, dark red kidney bean farmers from Minnesota, purchased revenue coverage, the Dry Bean Revenue Endorsement ("Endorsement"), to protect against a decline in bean prices as measured by the difference between the spring projected price and the fall harvest price. In 2015, such a decline occurred. However, Plaintiffs were told that, because there was not enough published pricing data to establish a harvest price, it would be set equal to the projected price per the terms of the Endorsement, which

converted their revenue coverage into mere yield protection. As a result, they received no recompense.

Plaintiffs brought claims under the Administrative Procedure Act ("APA") against Defendants—the United States Department of Agriculture ("USDA"), the Risk Management Agency ("RMA"), and the Federal Crop Insurance Corporation ("FCIC")—arguing that it was arbitrary and capricious for Defendants to allow the Endorsement to convert their revenue coverage into yield protection. Both parties then moved for summary judgment.

On August 21, 2020, the Court granted summary judgment to Defendants. However, when doing so, the Court relied on regulatory language not yet in effect at the time of the Endorsement's creation. Additionally, key facts—namely, that substantial changes were made to the relevant policy provision of the Endorsement after the FCIC Board ("Board") had approved a markedly different one—were only introduced at the last minute, months after oral argument. Given these compelling circumstances, ones potentially implicating errors of law or fact, the Court granted Plaintiffs permission to file a motion to reconsider.

Upon reconsideration, the Court finds that (1) the policy language approved by the Board was not the same as that finalized in the Endorsement offered for sale; (2) post-approval changes made to the language were "significant" under the regulations then in effect and therefore required resubmission to the Board, which did not occur; and (3) the

RMA did not have the authority to independently approve and help finalize these changes in the Endorsement. As such, Defendants violated the APA. Thus, the Court will reverse its earlier decision, and will deny summary judgment to Defendants and grant summary judgment to Plaintiffs.

**BACKGROUND**

**I.     FACTUAL BACKGROUND**

In an earlier decision, *Elbert v. U.S. Dep't of Agric.*, No. 18-1574, 2020 WL 4926635, at *2 (D. Minn. Aug. 21, 2020), the Court laid out the relevant facts in detail, which the Court will summarize here. Additionally, the Court will supplement the background as needed.[1]

**A.     Federal Crop Insurance**

The FCIC provides reinsurance for crop insurance policies approved pursuant to the Federal Crop Insurance Act ("FCIA"). 7 U.S.C. § 1508. Private-party applicants design such policies and policy provisions, and then make what is termed a 508(h) submission to the Board. *Id.* § 1508(h)(1)(A). The Board must approve a 508(h) submission if it determines, among other things, that the crop insurance policy will adequately protect the interests of producers. *Id.* § 1508(h)(3)(A)(i).

---

[1] Additional citations to the administrative record will be paginated with the original FCIC numbering for ease of review and will include a reference to the corresponding docket number. The administrative record was certified as containing "those documents considered by the decision-maker." (Decl. Zachary White ¶ 4, Aug. 14, 2019, Docket No. 115.)

B. The Pulse-Crop Policy

1. The 508(h) Submission

In the fall of 2011, Watts and Associates, Inc., the Northarvest Bean Growers Association, and the USA Dry Pea and Lentil Council (collectively, "Watts") made a 508(h) submission to the Board.[2] (FCIC827, Docket No. 116-34.) For an additional premium, Watts proposed to offer pulse-crop farmers revenue coverage to insure against crop-price declines, as measured by the difference between the spring projected price and the fall harvest price.[3] (*See id.* at FCIC830.)

The Watts submission set out that, because there is no futures market for pulse crops, the projected price would be set by obtaining the contract prices from processors in January and February. (*Id.* at FCIC875.) The harvest price would be set based upon weekly sales-price data published by the AMS Bean Market News during the fall months. (*Id.* at FCIC875–876.)

If AMS data was insufficient to set the harvest price for a crop year, the proposed policy provisions, specifically section 3(c)(2), set out that "[a] harvest price will be determined and announced by FCIC in lieu of the terms contained in the definition of harvest price[.]" (*Id.* at FCIC988.) Similarly, the Handbook proposed to accompany the policy stated that "[i]f a harvest price cannot be determined . . . [the] RMA will establish

---

[2] The concept behind the proposed policy was first approved for further development by the Board in November 2010. (FCIC764, Docket No. 116-27.)
[3] Pulse crops are legumes harvested for their dry seed.

-4-

the harvest price." (*Id.* at FCIC1017.) In the rating methods section of the submission, Watts also noted that it "recommend[ed] that the projected price be substituted for any missing AMS monthly harvest price observations" when the harvest price cannot be determined. (*Id.* at FCIC894.)

### 2. Expert Review of the Submission

On November 17, 2011, the Board approved expert review of the submission. (FCIC1174, Docket No. 116-35). One expert cautioned that "[h]istorically, there have been occasions when AMS failed to report harvest price data during these months for some types of dry beans." (FCIC1239, Docket No. 116-38.) The expert also warned against Watts's recommendation:

> In the extreme case where AMS fails to report a price for September, October, and November the harvest price would be equal to the projected price and the revenue insurance product . . . would revert to a yield insurance product . . . We understand the need to have a contingency plan for situations when AMS fails to report a price. However, it seems unfair to growers who pay for revenue insurance for that contingency plan to effectively shift the policy away from revenue coverage and toward yield coverage.[4]

(*Id.* at FCIC1240.)

---

[4] As the name implies, yield protection only covers the value of expected crop yields as projected in the spring, not the loss of revenue due to a price decline in the fall. *See* 7 C.F.R. § 457.8 (defining "revenue protection" and "yield protection").

### 3. Docketing of the Submission

After expert review of the submission, the RMA presented an executive summary and docket report for the Board's review. (FCIC1437, Docket No. 116-45.) The RMA commented upon a general concern involving the recommendation to substitute the projected price for the harvest price when AMS prices were not available, as this would "essentially convert[] the revenue offer to yield protection with the insured paying the premium for revenue coverage but only getting yield coverage." (*Id.* at FCIC1442.)

The RMA also shared this concern with Watts. (FCIC1175–76, Docket No. 116-36.) Watts replied that the "language in the submission regarding inability to determine the harvest price when the projected price has been determined is substantially the same as that of section 3(c)(5) of [the Basic Provisions of the Common Crop Insurance Policy]." (*Id*. at FCIC1182.) Much like the policy provision proposed by Watts, section 3(c)(5) of the Basic Provisions states that "[i]f the projected price or harvest price cannot be calculated for the current crop year . . . [r]evenue protection will continue to be available; and [t]he harvest price will be determined and announced by FCIC." 7 C.F.R. § 457.8.

### 4. Approval of the Submission

The Board took up final consideration of Watts's proposal on March 1, 2012. (FCIC820, Docket No. 116-32.) A PowerPoint was presented, which stated that substituting the projected price for the harvest price would covert the proposed revenue-coverage policy to yield protection. (FCIC1462, Docket No. 116-46.)

Afterward, the Board, "pursuant to the information contained in [the Watts submission], as well as other material that were submitted to the Board on this matter," approved the pulse-crop policy "with reinsurance and administrative and operating subsidy in amounts and under such terms and conditions as determined appropriate by the Manager as authorized under section 508(h) of the Federal Crop Insurance Act."[5] (FCIC1499, Docket No. 116-49.) The Board also delegated to the Manager "the authority to make such technical policy changes as are necessary to make the policy legally sufficient." (*Id.*)

### 5. Post-Approval Changes

Shortly after the Board meeting in March 2012, the RMA sent a highlighted copy of the approved policy provisions to Watts along with comments, one of which involved section 3(c)(2)'s language establishing that the FCIC will determine and announce a harvest price when there is insufficient price data.[6] (FCIC1559, Docket No. 116-52.) Watts responded, "[w]ith regard to the question about how RMA is to determine a harvest price, the language contained in these crop provisions is identical to the language contained in the Basic Provisions," again referencing section 3(c)(5) of the Basic Provisions whereby the FCIC will determine and announce the harvest price when it cannot be calculated for a crop year. (FCIC1572–73, Docket No. 116-53.)

---

[5] The Administrator of the RMA is the Manager of the FCIC. 7 U.S.C. § 6933(c)(2).
[6] The document does not preserve what the RMA's comments were.

For reasons unclear from the administrative record, by November 1, 2012, section 3(c)(2) had been completely rewritten.[7] It now read: "If the harvest price cannot be calculated . . . the harvest price will be equal to the projected price." (FCIC1501, Docket No. 116-50.)

**C.      2015 Crop Year**

The Endorsement purchased by Plaintiffs in 2015 contains the rewritten section 3(c)(2), not the one contained in Watts's 508(h) submission. (*See* 3rd Am. Compl., Ex. A at 2, Feb. 26, 2019, Docket No. 89-2.) By December 2015, it became clear that there would not be sufficient data by which to establish a harvest price for dark red kidney beans in Minnesota. (FCIC2350, Docket No. 117–27.) As a result, on December 15, the RMA announced that, per section 3(c)(2) in Plaintiffs' Endorsement, "the harvest price will be equal to the projected price when a harvest price cannot be determined." (FCIC2326, Docket No. 117-25.)

Because the harvest price had been set equal to the projected price, Plaintiffs' revenue coverage was "essentially [made into] an expensive yield policy," which meant that they could not recoup their losses.[8] (*See* FCIC10797, Docket No. 120-20.)

---

[7] The post-approval period was also when it was decided to structure the policy as an endorsement instead. (FCIC1586, Docket No. 116-54.)

[8] Following this outcome, on December 31, 2015, Watts proposed pricing changes to resolve AMS data deficiency issues. (FCIC14381, Docket No. 121-6.) The RMA determined that the changes required resubmission to the Board. (FCIC13915, Docket No. 121-3.) The Board approved the submission for expert review on February 10, 2016,

*(footnote continued on next page)*

-8-

Additionally, Plaintiffs were not allowed a refund of the additional premium that they had paid for revenue coverage. (*See id.* at FCIC10795.)

## II. PROCEDURAL BACKGROUND

This case was brought initially as a putative class action in the Eastern District of Michigan. (Compl., June 5, 2017, Docket No. 1.) The Michigan court dismissed the Minnesota Plaintiffs for improper venue and transferred them here. (Order Granting Mot. Dismiss at 28, April 18, 2018, Docket No. 70; Transfer, June 8, 2018, Docket No. 81.) Plaintiffs then filed a Third Amended Complaint. (3rd Am. Compl., Feb. 26, 2019, Docket No. 89.)

On September 6, 2019, Plaintiffs moved for summary judgment, arguing that Defendants acted arbitrarily and capriciously in setting the harvest price equal to the projected price in 2015. (Mot. Summ. J., Sept. 6, 2019, Docket No. 131.) Defendants moved for dismissal or, in the alternative, summary judgment. (Mot. Dismiss & Mot. Summ. J., Oct. 25, 2019, Docket No. 141.) Several months after oral argument, the parties submitted supplemental briefing to address whether the post-approval rewriting of section 3(c)(2) violated the APA. *Elbert*, 2020 WL 4926635, at *16 n.7.

On August 21, 2020, the Court granted summary judgment to Defendants, concluding that Plaintiffs failed to demonstrate that Defendants' actions were arbitrary

---

(FCIC14381, Docket No. 121-6), and approved the submission on June 3, 2016, (FCIC14491, 14494, Docket No. 121-14.)

and capricious.  *Id.* at *1, 17.  Additionally, the Court rejected Plaintiffs' assertions that changes made to section 3(c)(2) after Board approval mandated a new submission and that the RMA had acted outside the scope of its delegated authority.  *Id.* at *16 n.7.

On September 3, 2020, Plaintiffs requested permission to file a motion to reconsider.  (Request, Sept. 3, 2020, Docket No. 172.)  The Court granted Plaintiffs permission to address whether changes made to section 3(c)(2) were "significant" as defined by regulations in effect in 2012; and, if significant, whether the Board's delegation of authority to the RMA obviated any need to resubmit them to the Board.  (Order at 6–7, Oct. 1, 2020, Docket No. 173.)  Plaintiffs have therefore filed a Motion to Reconsider.  (Mot. Reconsider, Oct. 23, 2020, Docket No. 180.)

### III. MICHIGAN LITIGATION

The claims of the Minnesota and Michigan parties are closely related—the core of both complaints is that Defendants acted arbitrarily and capriciously regarding the Endorsement's pricing mechanism for the harvest price when it cannot be calculated for a crop year.  (*Compare* 3rd Am. Compl., *with* 2nd Am. Compl., April 30, 2018, Docket No. 72.)  The Michigan court also granted summary judgment in favor of Defendants.  *Ackerman Bros. Farms, LLC v. U.S. Dep't of Agric.*, No. 17-11779, 2019 WL 3067927, at *13 (E.D. Mich. July 12, 2019), *reconsideration denied sub nom. Ackerman v. U.S. Dep't of Agric.*, No. 17-11779, 2019 WL 6837785 (E.D. Mich. Dec. 16, 2019).

However, on April 28, 2021, the Sixth Circuit reversed, in part, the Michigan decision. *Ackerman v. U.S. Dep't of Agric.*, 995 F.3d 528, 529 (6th Cir. 2021). The Sixth Circuit noted that the 508(h) submission approved by the Board in 2012 proposed that section 3(c)(2) would do exactly what the Basic Provisions do: "provide that the 'harvest price will be determined and announced by FCIC[.]'" *Id.* at 530–31. Additionally, the proposed and approved Handbook "likewise provided that, in the event of insufficient data from the Bean Market News, the RMA would set the harvest price." *Id.* at 531. The court then stated that:

> for reasons that are obscure on this record, the policies actually sold to Minnesota and North Dakota bean farmers did not include those same provisions from the approved endorsement and Handbook. Quite the contrary: the endorsement for the policies sold in those states provided that, in the event of insufficient data from the Bean Market News, "*the harvest price will be equal to the projected price*. As a result, the pricing mechanism in these policies would simply default to the projected price—which would make the revenue protection virtually worthless, since for the most part that coverage requires payment to the farmer only when the harvest price falls *below* the projected price.

*Id.*

The Sixth Circuit determined that the language of section 3(c)(2) in the Endorsement sold in Minnesota, language which then made its way into the Endorsement

-11-

sold in Michigan,[9] was not the language actually approved by the Board. *Id.* at 532. Additionally, because the post-approval changes involved changes to pricing methodologies, they were "significant" and thus required resubmission to the Board and another round of expert review, per agency regulations. *Id.* 532–33 (citing 7 C.F.R. §§ 400.701, 400.706, 400.709)). Furthermore, the agency was required to adequately consider whether the change to the default pricing mechanism—now setting the harvest price equal to the projected price instead of having the agency determine and announce it—adequately protected the interest of farmers. *Id.* at 533.

The Sixth Circuit concluded that the agency failed on all accounts and therefore violated the APA. *Id.*

## DISCUSSION

**I.     STANDARD OF REVIEW**

Under the Local Rules, after demonstrating compelling circumstances, a party may file a motion to reconsider with express permission of the Court. D. Minn. L.R. 7.1(j). Motions to reconsider "serve a limited function: to correct manifest errors of law or fact or to present newly discovered evidence." *Hagerman v. Yukon Energy Corp.*, 839 F.2d 407, 414 (8th Cir. 1988) (citation omitted).

---

[9] On July 8, 2013, when submitting a maintenance package for the Minnesota and North Dakota program, Watts suggested offering the policy to Michigan farmers. (FCIC2171, 2173, Docket No. 117-18.) On August 8, 2013, the Board approved Watts's submission to expand revenue coverage into Michigan, after first noting that the requested expansion was "non-significant." (FCIC2317, Docket No. 117-22.)

The decision under reconsideration is the Court's August 21, 2020 Memorandum Opinion and Order granting summary judgment to Defendants.[10] When reviewing agency action under the APA, the Court "shall review the whole record" and, as relevant here, "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious," or "without observance of procedure required by law[.]" 5 U.S.C. § 706.

## II. ANALYSIS

Previously, the Court concluded that changes made to section 3(c)(2) after the Board approved Watts's 508(h) submission in March 2012 were non-significant because they "involve[d] concepts that [had] been previously sent for expert review," and thus did not require resubmission. *Elbert*, 2020 WL 4926635, at *16 n.7 (quoting 7 C.F.R. § 400.701 (2016)).[11] Additionally, the Court noted that the Board had delegated authority to the RMA to make changes to the policy, and that Plaintiffs had not demonstrated that this delegation was improper. *Id.* Working with a rushed set of facts and the wrong regulatory language, the Court erred in both respects.

---

[10] Summary judgment is appropriate where there are no genuine issues of material fact and the moving party can demonstrate that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A fact is material if it might affect the outcome of the suit, and a dispute is genuine if the evidence is such that it could lead a reasonable jury to return a verdict for either party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[11] Some of the regulations that the Court will interpret were modified since 2011-12, when Watts made its submission and post-approval changes were made. When relevant, the Court will note the version of the regulation being interpreted.

## A. Significance of the Post-Approval Changes

The Court agrees with the Sixth Circuit: the pricing mechanism in the 508(h) submission approved by the Board established that, when AMS price data was lacking, the harvest price would be determined and announced by the agency. Not only did Watts's proposed section 3(c)(2) contain identical language, but so did the Handbook proposed to accompany the policy. Moreover, during the entire process up to and even after Board approval, Watts maintained that having the agency determine and announce the harvest price was the policy's intended default pricing mechanism. The sum of these facts far outweighs Defendants' claim that one sentence within the voluminous submission—one merely recommending that the projected price be substituted for missing monthly data—clearly demonstrates that the Board approved a completely different pricing mechanism, especially as agency regulations require that all applicable provisions be included in the 508(h) submission to the Board, not crafted roughly nine months after approval.[12] *See* 7 C.F.R. § 400.705(d)(1)(i).

Furthermore, the Board was unmistakably told three times that setting the harvest price equal to the projected price would make the policy worthless, as it would convert

---

[12] Defendants also argue that because the Board was aware of an ownership issue related to having the agency approve of certain prices, the Board must have considered and approved, in advance, subsequent changes to section 3(c)(2). However, the RMA's concern related to the proposed definitions for projected price and harvest price found in a separate provision of the policy, not section 3(c)(2). (*See* FCIC825–826, Docket No. 116-33; FCIC987, Docket No. 116-34.) As such, this argument is unavailing.

the policy's intended revenue protection into mere yield protection: an expert reviewer stated that it would be unfair to have farmers pay additional premiums and only receive yield coverage; the RMA stated the same concern to the Board before its March 2012 meeting; and, at the meeting, the Board was again instructed that substituting the projected price for the harvest price would strip away the policy's revenue coverage. Given that the proposed policy was specifically designed to offer revenue coverage to pulse-crop producers for the first time, and the Board's clear mandate to ensure that a proposed policy adequately protects the interests of the insured, 7 U.S.C. § 1598(h)(3)(A)(i), it is simply untenable, as Defendants assert, that the Board approved a pricing mechanism to have the policy default into yield protection and be rendered completely worthless as a result.[13]

Thus, with the Board having only approved a pricing mechanism whereby the harvest price would be determined and announced by the agency, not one setting the harvest price equal to the projected price, the post-approval changes to section 3(c)(2) were significant: they undoubtedly affected a pricing methodology, the amount of coverage that would be afforded to farmers (defaulting from revenue to yield protection), the farmers' interests (paying additional premiums for no additional coverage), and the amount of loss to be paid (dropping from the difference between the projected price and

---

[13] The Court notes that, had the Board approved such a pricing mechanism like Defendants claim, then it would have acted arbitrarily and capriciously by failing to adequately consider the interests of Plaintiffs. *Accord Ackerman*, 995 F.3d at 533.

the harvest price to zero). 7 C.F.R. § 400.701 (2009) (defining "significant change"). As such, the post-approval changes needed to be resubmitted to the Board and considered as a new submission, *see* 7 C.F.R. § 400.709(a)(2) (2005), but they were not.[14] Thus, the agency acted without observance of procedure required by law and therefore violated the APA.[15] 5 U.S.C. § 706(2)(D); *accord Ackerman*, 995 F.3d at 533.

### B. Authority of the RMA

Defendants argue that, even if the post-approval changes were significant, the RMA was authorized to implement these changes independently, as the Board stated that the RMA was to determine "[appropriate] terms and conditions. . . as authorized under section 508(h) of the Federal Crop Insurance Act" and delegated authority to the RMA "to make such technical policy changes . . . necessary to make the policy legally sufficient" when approving Watts's submission. (FCIC1499, Docket No. 116-49.)

However, the post-approval changes made to section 3(c)(2) cannot be considered appropriate terms or conditions authorized under the FCIA. As already mentioned, the FCIA mandates that 508(h) submissions adequately protect the interests of the insured.

---

[14] Additionally, as a new submission, certain procedures would be triggered, *see* 7 C.F.R. § 400.706(b) (2005), none of which occurred here.

[15] The Court notes that, even if the changes to section 3(c)(2) were considered non-significant, nothing additional was submitted to the FCIC until Watts proposed expanding the program into Michigan in 2013, which would have violated the APA as well. *See* 7 C.F.R. § 400.709(a)(2) (2009) (requiring non-significant changes to be submitted to the FCIC no later than 180 days prior to the earliest contract change, which fell on June 3, 2012 here).

A pricing mechanism that functions to convert revenue protection into yield protection does not afford adequate protection to an insured who paid an additional premium for the sole reason of securing revenue coverage in lieu of mere yield protection. Thus, if considered as changes made pursuant to the FCIA, the RMA failed to adequately consider the impact of the default pricing mechanism on producers' interests, and its actions were therefore arbitrary and capricious in violation of the APA. 5 U.S.C. § 706(2)(A); *accord Ackerman*, 995 F.3d at 533.

With respect to the language delegating authority, Defendants argue that section 3(c)(2) was not yet legally sufficient when approved, as there was a purported ownership issue that the RMA had flagged pre-approval. However, as noted above, the RMA's concern centered on an entirely separate provision of the proposed policy, not section 3(c)(2).[16] Defendants also suggest that having the agency determine and announce the harvest price was not a legally sufficient pricing mechanism. Given that the pricing mechanism approved by the Board mirrors that of the Basic Provisions of the Common Crop Insurance Policy, this suggestion falls flat. As such, there is no indication in the record that section 3(c)(2), as approved, was not already legally sufficient.

Additionally, the post-approval changes were not merely technical, as they significantly affected section 3(c)(2)'s pricing methodology, as well as the amount of coverage and the amount of loss to be paid offered under the Endorsement and its

---

[16] *See supra* note 12.

protection of farmers' interests.[17] Thus, as discussed above, these changes needed to be resubmitted to the Board, not considered solely by the RMA. 7 C.F.R. § 400.709(a)(2) (2005). Moreover, only Watts could have made such changes, not the RMA. *Id.* As such, if considered as technical policy changes, the RMA acted without observance of procedure required by law and therefore violated the APA. 5 U.S.C. § 706(2)(D).

**CONCLUSION**

Having concluded that the Board did not approve the language of section 3(c)(2) as finalized in the Endorsement sold to Plaintiffs, and that post-approval changes made to the section's language violated the APA, the Court will grant Plaintiffs' Motion to Reconsider. Accordingly, the Court will reverse its earlier decision, and will grant Plaintiffs' Motion for Summary Judgment and deny Defendants' Motion for Summary Judgment.

However, given the circuitous path traveled in reaching this point, one involving newly discovered facts presented months after oral argument and a reconsideration of these facts, the parties' earlier arguments regarding an appropriate remedy may no longer be entirely on point. Additionally, the Endorsement purchased by Plaintiffs clearly stated that the harvest price will equal the projected price when the former could not be

---

[17] The Court notes that, while "technical policy changes" are not explicitly defined by statute or regulation, the phrase tracks the definition for "non-significant changes." *See* 7 C.F.R. § 400.701 (2009) ("Minor changes to the policy or plan of insurance, such as technical corrections[.]").

calculated, which further complicates determining an appropriate remedy. Thus, the Court will order additional briefing to address what remedy the Court should now extend.

**ORDER**

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Plaintiffs' Motion to Reconsider [Docket No. 180] is **GRANTED** and therefore:

   a. Plaintiffs' Motion for Summary Judgment [Docket No. 131] is **GRANTED**; and

   b. Defendants' Motion to Dismiss and Motion for Summary Judgment [Docket No. 141] is **DENIED**.

2. The parties are directed to file briefs addressing what remedy is appropriate. Simultaneous briefs are to be filed 45 days after entry of this Order.

DATED: June 29, 2021                    _____
at Minneapolis, Minnesota.             JOHN R. TUNHEIM
                                                                 Chief Judge
                                         United States District Court