**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

RICH ELBERT, JEFF A. KOSEK, REICHMANN
LAND & CATTLE LLP, LUDOWESE A.E. INC.,
and MICHAEL STAMER, *individually and
on behalf of a class of similarly situated
persons*,

Civil No. 18-1574 (JRT/TNL)

Plaintiffs,

v.

UNITED STATES DEPARTMENT OF
AGRICULTURE, RISK MANAGEMENT
AGENCY, and FEDERAL CROP INSURANCE
CORPORATION,

**MEMORANDUM OPINION AND ORDER**

Defendants.

John D. Tallman, **JOHN D. TALLMAN, PLLC**, 4020 East Beltline Avenue
Northeast, Suite 101, Grand Rapids, MI 49525; Markus C. Yira, **YIRA LAW
OFFICE, LTD**, P.O. Box 518, Hutchinson, MN 55350, for plaintiffs.

David W. Fuller, **UNITED STATES ATTORNEY'S OFFICE,** 300 South Fourth
Street, Suite 600, Minneapolis, MN 55415, for defendants.

Plaintiffs, dark red kidney bean farmers from Minnesota, purchased revenue

insurance coverage—the Dry Bean Revenue Endorsement ("Endorsement")—to protect

against a decline in bean prices as measured by the difference between the spring

projected price and the fall harvest price. In 2015, such a decline occurred. There was

also insufficient published pricing data to establish a harvest price under the

Endorsement's default harvest pricing method. The harvest price was then set as equal

to the projected price per the contingency pricing terms of the Endorsement.  Plaintiffs, therefore, received no compensation.

Plaintiffs brought claims under the Administrative Procedure Act ("APA") against Defendants—the United States Department of Agriculture ("USDA"), the Risk Management Agency ("RMA"), and the Federal Crop Insurance Corporation ("FCIC")—arguing that it was arbitrary and capricious for Defendants to allow the Endorsement to convert their revenue coverage into yield protection.  The parties then filed cross motions for summary judgment.

After the Court granted summary judgment to the Defendants, Plaintiffs received permission to file a motion to reconsider.  Upon reconsideration, the Court concluded the Defendants had violated the APA.  The Court then reversed its prior decision and denied summary judgment to the Defendants and granted summary judgment to Plaintiffs.

The Court then ordered the parties to submit additional briefing to address what remedy the Court should grant.  The Defendants request the Court remand to the FCIC for further consideration without vacating the existing policy.  Plaintiffs request the Court reform the insurance policy contracts to state that the FCIC will establish a harvest price when there is insufficient published data to otherwise set a harvest price and then order the FCIC to establish a price for 2015.  Plaintiffs also moved to certify a class.

In accordance with the default remedy for APA violations, the Court will vacate the existing agency action and remand to the agency for further consideration.  Vacating is

appropriate instead of leaving the Defendants' action intact for now because of the serious procedural failures and because it is unlikely the Defendants made the correct choice by approving the Endorsement as is. Remanding is appropriate because the Defendants have the relevant expertise and are better positioned in the first instance to balance the impact on various stakeholders of any change to the policy.

The Court will also deny the Plaintiffs' Class Certification Motion as moot.

## BACKGROUND

### I.   FACTUAL BACKGROUND

In its earlier decisions, the Court laid out the relevant facts in detail. *Elbert v. U.S. Dep't of Agric.* ("*Elbert I*"), No. 18-1574, 2020 WL 4926635, at *1–8 (D. Minn. Aug. 21, 2020); *Elbert v. United States Dep't of Agric.* ("*Elbert II*"), 546 F. Supp. 3d 814, 816–18 (D. Minn. 2021). The record contains no additional factual development since *Elbert II* whose factual summary the Court adopts in full and summarizes here.

The FCIC provides reinsurance for crop insurance policies approved pursuant to the Federal Crop Insurance Act ("FCIA"). Private parties design the policies and submit them to the FCIC Board through what is called a 508(h) submission. The Board must approve a 508(h) submission if it determines, among other things, that the crop insurance policy will adequately protect the interests of producers.

In 2011, Watts and Associates, Inc., the Northarvest Bean Growers Association, and the USA Dry Pea and Lentil Council (collectively, "Watts") made a 508(h) submission

to the Board proposing to offer revenue protection to pulse-crop farmers to insure against a drop in the price of crops as measured by the projected price in the spring and the actual harvest price in the fall.[1]  The submission provided that the projected price would be obtained from processors in January and February and the harvest price would be set using data published by the AMS Bean Market News (the "AMS Method").

Watts foresaw that it was possible that there would be insufficient AMS data to set a harvest price, and therefore a contingency procedure was necessary.  The proposed policy provisions and the proposed handbook to accompany the policy stated that if the AMS Method failed, an agency would set the harvest price.  The rating methods section of the submission, however, proposed that the projected price be substituted for the harvest price if the AMS Method failed.

During the agency review process for the submission, an expert reviewer and the agency noted that substituting the projected price would convert the policy into a yield protection policy even though farmers would have paid for revenue protection.  It was noted that such a policy would be unfair to farmers.  In response to this concern, Watts replied that the proposed policy would have the harvest price set by the FCIC whenever a harvest price could not be calculated and that revenue protection would still be available.

---

[1] Pulse crops are legumes harvested for their dry seed.

In 2012, the Board approved the submission pursuant to the information in the submission and other materials submitted to the Board but permitted the RMA to make technical policy changes necessary to make the policy legally sufficient. The RMA and Watts then began a process of converting the submission into a policy available for sale. When questions about the possible failure of the AMS Method arose, Watts referenced other existing crop insurance policies whereby the FCIC would set the harvest price rather than defaulting it to the projected price.

For reasons unclear in the administrative record, at some point the section of the policy dealing with the contingency procedure—Section 3(c)(2)—was completely rewritten. The language in the section did not match what had been submitted to and approved by the Board nor Watts's repeated assurances. Instead, the policy stated: "If the harvest price cannot be calculated in accordance with [the AMS Method,] the harvest price will be equal to the projected price." This change was not resubmitted to the Board.

In 2015, Plaintiffs purchased the Endorsement that contained this substituted language. In December 2015, it became clear that there would not be sufficient AMS data to establish a harvest price for dark red kidney beans in Minnesota. As a result, the RMA announced that pursuant to the policy language in the Endorsement, the harvest price would be set to the projected price. As predicted, this essentially converted the Plaintiffs' revenue policies into expensive yield policies. To make matters worse for farmers, the price farmers actually received at harvest for dark red kidney beans fell. Indeed, Watts

explained that the lack of pricing data was caused by the same forces that caused the price to fall.  Because the harvest price could not be set, Plaintiffs could not recoup their revenue losses.

## II.   PROCEDURAL BACKGROUND

This case was brought initially as a putative class action in the Eastern District of Michigan on behalf of farmers in Michigan, Minnesota, and North Dakota.  (Compl., June 5, 2017, Docket No. 1.)  The Michigan court transferred the Minnesota plaintiffs here. (Order, June 1, 2018, Docket No. 80.)  Plaintiffs then filed a Third Amended Complaint. (3rd Am. Compl., Feb. 26, 2019, Docket No. 89.)[2]

The parties filed cross motions for summary judgment.  (Pls.' Mot. for Summ. J., Sept. 6, 2019, Docket No. 131; Defs.' Mot. to Dismiss or for Summ. J., Oct. 25, 2019, Docket No. 141.)  The Court denied Plaintiffs' motion and granted summary judgment to Defendants.  *Elbert I*, 2020 WL 4926635, at *17.  Plaintiffs requested permission to file a motion to reconsider, the Court granted the request, and Plaintiffs filed a motion to reconsider.  (Request, Sept. 3, 2020, Docket No. 172; Order, Oct. 1, 2020, Docket No. 173; Mot. Reconsider, Oct. 23, 2020, Docket No. 180.)

The Court reversed its first summary judgment order, denied Defendants' motion, and granted Plaintiffs' motion for summary judgment.  *Elbert II*, 546 F. Supp. 3d at 823.

---

[2] Plaintiffs' Complaint was amended twice before transfer to the District of Minnesota. (1st Am. Compl., Nov. 9, 2017, Docket No. 50; 2nd Am. Compl., Apr. 30, 2018, Docket No. 72.)

The Court did so because the agency acted without observance of procedure and in doing so violated the APA.  *Id.* at 821–23.  The Court then ordered the parties to submit briefing on the appropriate remedy.  *Id*. at 823.

Plaintiffs ask the Court to (1) reform the policies under a theory of either mutual or unilateral mistake to state that the FCIC will announce a harvest price whenever the AMS method fails and (2) order the FCIC to announce a harvest price for 2015.  (Pls.' Br. at 9–10, 15, Aug. 20, 2021, Docket No. 199.)  The Defendants ask the Court to remand to the agency for further review without vacating the agency action.  (Defs.' Br. at 10, 19, Aug. 20, 2021, Docket No. 200.)  Plaintiffs have also filed a renewed Motion to Certify a Class.[3]  (Mot. to Certify Class, Aug. 25, 2021, Docket No. 201.)

### III.   MICHIGAN LITIGATION

After transferring the Minnesota Plaintiffs here, the case has proceeded in Michigan under closely related claims.  After the Michigan court granted summary judgment in favor of the Defendants, the Michigan Plaintiffs appealed, and the Sixth Circuit reversed in part.  *Ackerman v. U.S. Dep't of Agric.*, 995 F.3d 528, 529 (6th Cir. 2021).  The Sixth Circuit held that the FCIC's approval of the Michigan policy did not observe the required procedure and "the agency did not adequately consider the impact of the default pricing mechanics . . . [n]or did the agency adequately consider whether 'the interests of

---

[3] The Plaintiffs filed an earlier motion to certify a class, but the parties agreed that the motion was withdrawn without prejudice.  (Mot. to Certify Class, Apr. 15, 2019, Docket No. 94; Pretrial Scheduling Order at 3, June 27, 2019, Docket No. 102.)

producers [were] adequately protected.'"  *Id.* at 533 (quoting 7 U.S.C. § 1508(h)(3)(A)(i))
(alteration in original).  Therefore, the Sixth Circuit found the agency's approval to be
arbitrary and capricious and remanded the case to the district court.  *Id.* at 533–34.

On remand, the Michigan court also sought briefing on the remedy for the APA
violation.  *Ackerman Bros. Farms, LLC v. U.S. Dep't of Agric.*, No. 17-11779, 2021 WL
6133910, at *3 (E.D. Mich. Dec. 29, 2021).  The parties took the same positions they took
here: the Michigan farmers sought contract reformation and the Defendants sought
remand without vacatur.  *Id.*  The Michigan farmers also moved to certify a class.  *Id.* at
*7.  The court agreed with Defendants' proposed remedy and remanded the matter to
the FCIC without vacating the agency's decision.  *Id.* at *7.  The court, however, ordered
the FCIC to treat the submission "as a new 508(h) submission and carefully consider
whether 'the interests of [farmers] are adequately protected.'"  *Id.* (quoting 7 U.S.C. §
1508(h)(3)(A)).  And the court denied Plaintiffs' class certification motion as moot.  *Id.*

## DISCUSSION

### I.   REMEDY

The APA provides that a reviewing court shall "hold unlawful and set aside agency
action, findings, and conclusions found to be—(A) arbitrary, capricious, an abuse of
discretion, or otherwise not in accordance with law . . . [or] (D) without observance of
procedure required by law."  5 U.S.C. § 706(2).  In other words, "[t]he ordinary practice is
to vacate unlawful agency action."  *United Steel v. Mine Safety & Health Admin.*, 925 F.3d

1279, 1287 (D.C. Cir. 2019); *see Iowa League of Cities v. E.P.A.*, 711 F.3d 844, 875–76 (8th Cir. 2013) (vacating agency rules in accordance with 5 U.S.C. § 706(2)).   Courts then typically remand the issue to the agency for additional consideration rather than deciding the issue itself.   *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985) ("[T]he proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation.   The reviewing court is not generally empowered to conduct a *de novo* inquiry into the matter being reviewed and to reach its own conclusions based on such an inquiry.").   This is true even if a court would typically instruct a lower court exactly what to do if a similar situation arose through a lawsuit not arising under the APA. *See Dakota, Minnesota & E. R.R. Corp. v. U.S. Dep't of Lab. Admin. Rev. Bd.*, 948 F.3d 940, 947 (8th Cir. 2020) (refusing to instruct an agency to dismiss a petition for agency review).

Neither party requests this remedy, instead seeking other forms for equitable relief.   Plaintiffs ask the Court to reform the policy contracts to state that the FCIC will announce the harvest price when the AMS method fails and order the FCIC to announce a 2015 harvest price, arguing this remedy is consistent with what the Board approved, what farmers believed the policy provided, and what would adequately protect farmers' interests.   Defendants ask the Court to remand the issue for further agency review but to do so without vacating the approval, arguing remand would allow to agency to fix the errors identified while avoiding the serious disruption of vacating the approval.   Although

neither party requests this remedy, the Court will follow the ordinary practice of vacating the agency action and remanding the matter for additional consideration.

Courts have broad authority to shape equitable relief other than that authorized by the APA, including declaratory and injunctive relief, for APA violations. *See Bowen v. Massachusetts*, 487 U.S. 879, 893, 910–11 (1988); *Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Engineers*, 781 F.3d 1271, 1289–90 (11th Cir. 2015); *see also* 5 U.S.C. § 702.

For now, the Court will not grant the relief Plaintiffs seek. First, Plaintiffs do not cite—and the Court was unable to find—a case where a court reformed a crop insurance policy contract as a remedy for an APA violation.[4] Second, it is a close question whether Plaintiffs have demonstrated or could demonstrate all the necessary elements of contract reformation under Minnesota law especially as it relates to the insurers who are the other parties to the policy contracts. *See SCI Minnesota Funeral Servs., Inc. v. Washburn-McReavy Funeral Corp.*, 795 N.W.2d 855, 865 (Minn. 2011) (providing the elements of and defining the high burden for contract reformation). Third, although courts have broad authority to shape equitable relief, this power is not unlimited. *Missouri v. Jenkins*, 495 U.S. 33, 51 (1990). There are "fundamental limitations on the remedial powers of the

---

[4] Plaintiffs cite *Wiley v. Glickman*, No. 99-32, 1999 WL 33283312 (D.N.D. Sept. 3, 1999), to support contract reformation based on an APA violation. In *Wiley*, the FCIC approved an insurer's request to amend a crop insurance policy contract in the middle of the crop year. *Id.* at *7–8. Farmers sued to block enforcement of the midyear amendment, asking the court to enforce the terms of the contract farmers and the insurer signed. *Id.* at *17. The Court agreed and blocked the change. *Id.* at *17–18. In other words, the *Wiley* Court blocked a change to a contract, rather than changing the contract itself.

federal courts.  Those powers [can] be exercised only on the basis of a violation of the law and [can] extend no farther than required by the nature and the extent of that violation." *Gen. Bldg. Contractors Ass'n, Inc. v. Pennsylvania*, 458 U.S. 375, 399 (1982) (quotation and citations omitted); *accord St. Charles Tower, Inc. v. Kurtz*, 643 F.3d 264, 271 (8th Cir. 2011). The Court granted summary judgment based on a flawed agency process, but this remedy may affect the insurers who are now absent from this case.   Therefore, Plaintiffs' proposed remedy may extend beyond the Court's power to issue injunctive relief.  *See* Fed. R. Civ. P. 65(d)(2); *see also Kean v. Hurley*, 179 F.2d 888, 890–91 (8th Cir. 1950). Finally, contract reformation would amount to the Court solving the agency's error, but courts only rarely do so by directing specific courses of agency action.  *Dakota, Minnesota & E. R.R. Corp.*, 948 F.3d at 947–48; *N. Carolina Fisheries Ass'n, Inc. v. Gutierrez*, 550 F.3d 16, 20 (D.C. Cir. 2008) ("Only in extraordinary circumstances do we issue detailed remedial orders[.]").  The Court need not and does not resolve these difficult questions because it has an alternative remedy available—remand to the agency—that may sufficiently redress Plaintiffs' injuries and places the responsibility for crafting a solution back on the agency who created the problem.  *See Jenkins*, 495 U.S. at 51 (limiting injunctive relief when an alternative remedy is available and directing the responsible institution to develop solutions for the harm it created).  Indeed, given the effect that any change may have on various stakeholders including those that are not parties to this case, remand is all the more appropriate here.  Remand allows the agency to exercise its

expertise in the first instance to consider how to best protect the interests of farmers as required by the FCIA, while also considering the impact on all stakeholders.  Therefore, the Court will reject Plaintiffs' proposed solution and remand the matter to the agency for now.

Because the Court will remand the matter, it must decide whether to vacate the agency action or to do so without vacatur as the Defendants request.  Although not the default APA remedy, the Eighth Circuit has remanded while leaving an agency action intact and no circuit court has found that courts lack the power to remand without vacatur.  *U.S. Steel Corp. v. EPA*, 649 F.2d 572, 577 (8th Cir. 1981); *Black Warrior Riverkeeper*, 781 F.3d at 1290 (collecting cases); *see also WaterLegacy v. EPA*, 300 F.R.D. 332, 346–47 (D. Minn. 2014) (remanding without vacatur).  Courts generally apply a two-factor test, drawn from *Allied-Signal, Inc. v. United States Nuclear Regulatory Commission*, 988 F.2d 146 (D.C. Cir. 1993), when deciding whether to remand with or without vacatur. *See, e.g.*, *Black Warrior Riverkeeper*, 781 F.3d at 1290; *WaterLegacy*, 300 F.R.D. at 345–46 (applying *Allied-Signal* factors).

The first *Allied-Signal* factor is the seriousness of the agency's errors including considering the extent of doubt that the agency chose correctly.  *Allied-Signal*, 988 F.2d at 150.  As the Court explained in *Elbert II*, there were very serious procedural errors here. *Elbert II*, 546 F. Supp. at 822.  The Board approved one contingency pricing mechanism which was completely rewritten without the required resubmission to the Board as a

significant change.  *Id.*  Even if the change was not significant, it still exceeded the authority delegated by the Board to the RMA to make changes.  *Id.*  And even if this change could have been made, only Watts—not the agency—could legally have made it. *Id.* at 822–23.  Moreover, the policy language for this section was completely rewritten but nothing in the administrative record explains the reason for this change or even gives any indication Defendants reviewed or were aware of the change.  And to the extent this issue was raised before the Board during the submission process, Watts repeatedly stated that the policy would use the language originally in the policy, not the language in the policy as sold to Plaintiffs.  In sum, there was a series of serious procedural errors.  In addition to this cascade of procedural failures, there is considerable doubt the agency chose correctly.  The FCIA mandates that 508(h) submissions adequately protect the interests of the insured.  When the contingency method came up in the review process, it was accompanied by a note indicating that substituting the projected price for the harvest price would be unfair to farmers.  This is also what occurred in practice: the policy's contingency pricing mechanism converted revenue protection into yield protection for insureds who paid an additional premium for the sole reason of securing revenue protection, not yield protection.  And the record indicates that the reason there was insufficient data to use the AMS Method such that the contingency method was triggered was for the same reasons the price fell in 2015.  In other words, in the crop years

-13-

that farmers are most likely to need the revenue protection, they are least likely to get it. Therefore, it is unlikely that this policy adequately protects the interests of the insured.

In sum, the Board did not approve this change; there is nothing in the record indicating any agency even considered the change; even if an agency did in fact consider it, there is no explanation for the change available for judicial review; and it is highly doubtful the agency chose correctly.[5]  Indeed, given the procedural errors, it is doubtful the agency even made a conscious choice.  Therefore, the first *Allied-Signal* factor weighs in favor of vacatur.

The second *Allied-Signal* factor is the disruptive consequences of vacatur.  *Allied-Signal*, 988 F.2d at 150–51.  The full Dry Bean Revenue Endorsement covers hundreds of thousands of acres and involves millions of dollars in premiums and claims.  (FCIC14528, Docket No. 121-18.)  Fully vacating the Endorsement could disrupt these policies and lead to numerous disputes involving many non-parties such as insurers, farmers who are

---

[5] In their remedy brief, Defendants appear to make an argument for why the altered contingency pricing mechanism is in fact an appropriate choice: (1) it will rarely be triggered and (2) it is better than not offering revenue coverage at all.  (Defs.' Br. at 12–13.)  To the extent that the agency made a considered decision here, these are post hoc explanations.  Post hoc rationales for an agency decision offered in litigation are typically insufficient to uphold an agency action.  *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1909 (2020); *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 419 (1971).  While one of the experts noted that the potential failure of the AMS Method was an "extreme case," this still does not explain **why** a contingency method that substitutes the projected price for the harvest price adequately protects farmers' interests especially where the record does not disclose a reason for the choice and this expert explained that this method was flawed and unfair to farmers.  (*See* FCIC1240, Docket No. 116-38.)

satisfied with the coverage, and brokers. This would be disruptive and weighs against vacatur. Plaintiffs, however, only bring this action seeking to recover for dark red kidney bean farmers in Minnesota who paid for the Endorsement in 2015 who had their revenue protection converted to yield protection. In total, across Minnesota, Michigan, and North Dakota, 17,491 acres covering about $10.6 million in liabilities had their revenue protection converted to yield protection. (*Id.* at FCIC14527.)[6] While still potentially affecting non-parties, limiting the effects of a vacatur to just the policy at issue here would considerably limit the disruptive effect.

Balancing the *Allied-Signal* factors, vacatur is appropriate. The cascade of procedural failures and the considerable doubt that agency's choice was correct—to the extent it even made a choice—outweighs the potential disruptive consequences of vacatur especially because the Court will limit vacatur. The Court will only vacate the agency's approval of changing the contingency pricing mechanism from the one in the policy as approved by the Board to a method substituting the projected price for the harvest price. And the Court will only vacate it as it applies in Minnesota for the 2015 crop year for dark red kidney beans. All other language in the policy and all other policies are unaffected by this Order. The Court will then remand to the agency to reconsider whether to alter the originally approved language. Therefore, on remand, the FCIC must

---

[6] It is unclear in the record exactly how many acres and liabilities were affected by converting revenue protection to yield protection just for dark red kidney beans in Minnesota.

consider whether to amend the contingency pricing mechanism for dark red kidney beans in Minnesota for the 2015 crop year or to leave the originally approved method in place of having the FCIC establish a price.  The FCIC must consider this issue anew as if it had been properly resubmitted for approval in the first place.  It if decides to amend the approved policy, it must decide how to do so and justify its decisions.

**II.     MOTION FOR CLASS CERTIFICATION**

Plaintiffs also filed a renewed motion for class certification.  As discussed, Plaintiffs seek class-wide reformation of the 2015 policy contracts.  Because their Motion for Class Certification is predicated on a form of relief the Court will not grant for now, the Court will also deny Plaintiffs' Motion without prejudice as moot.

**ORDER**

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Plaintiffs' Motion to Certify a Class [Docket No. 201] is **DENIED** as moot; and

2. The approval of the amendment to Section 3(c)(2) Dry Bean Revenue Endorsement as applied to dark red kidney beans in Minnesota for crop year 2015 is **VACATED and REMANDED** to the Federal Crop Insurance Corporation for reconsideration consistent with this opinion.

DATED:  July 11, 2022
at Minneapolis, Minnesota.

_____
JOHN R. TUNHEIM
Chief Judge
United States District Court